Thomas C. POLLGREEN, et al., Plaintiffs,

v.

Raymond A. MORRIS, et al., Defendants.

John FERNANDEZ, Sr., et al., Plaintiffs,

v.

Raymond A. MORRIS, et al., Defendants.

Nos. 80–1412–Civ–SMA, 80–1414–Civ–SMA.

United States District Court, S.D. Florida.

Jan. 24, 1984.

Diane R. Tolbert, New York City, Thomas J. Sireci, Francis H. Muldoon, Jr., Key West, Fla., for plaintiffs.

Robert Rosenberg, Asst. U.S. Atty., Miami, Fla., Robert Kendall, Dept. of Justice, Washington, D.C., for defendants.

## MEMORANDUM OPINION GRANTING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND DENYING DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

ARONOVITZ, District Judge.

### Nature of the Action

### and

### Jurisdiction

The 19 plaintiffs in these two consolidated law suits are owners, managing agents or representatives, or captains of 31 U.S. commercial fishing vessels, American citizens who resided or were quartered in and about Key West, Florida. From April through June 1980, these vessels participated, usually for one trip each, in the 1980 "Cuban Refugee Freedom Flotilla", and were seized after landing Cuban nationals in Key West, Florida.[1]

Asserting jurisdiction under 28 U.S.C. §§ 1331, 1355 and 1356 and alleging deprivation of their due process rights secured under the Fifth Amendment to the U.S. Constitution, plaintiffs filed this action against defendants Morris and Powell of the Immigration and Naturalization Service and Angle and Battard of Customs Service. Plaintiffs seek a declaration that the vessel seizures were unlawful and an injunction permanently enjoining defendants from seizing the 31 vessels or seeking to levy any fines under 8 U.S.C. §§ 1321, 1323 and 1324.[2] This Court has jurisdiction of the subject matter and the parties pursuant to the aforesaid jurisdictional citations.

### Procedural Background

Prior to June 25, 1980, the subject vessels were seized by defendants and subject

---

1. Plaintiffs are seeking declaratory and injunctive relief with respect to the following fishing vessels:

| | |
|---|---|
| "Tom's Tub Too" | Plaintiff/Pollgreen |
| "Rose Lee" | Plaintiff/Roseman |
| "Iraida" | Plaintiff/Hernandez |
| "Father and Son" | Plaintiff/Vasquez |
| "Captain Henry" | Plaintiff/Fernandez |
| "Thunderbolt" | " |
| "Skippie and David" | " |
| "Kraut & Cracker" | " |
| "Sun Hippie" | Plaintiff/Foltz |
| "Sun Lioness" | " |
| "Miss To Nicey" | " |
| "Christina-M" | Plaintiff/Pierce |
| "Melanie" | Plaintiff/Rego |
| "Patsy Ann" | Plaintiff/Trujillo |
| "Terry Lynn" | Plaintiff/Montague |
| "Lamanda Louise" | Plaintiff/Hickman |
| "Captain Jeffrey" | Plaintiff/Weed |
| "Red Cloud" | Plaintiff/Knowles |
| "D.J.&C." | Plaintiff/Clark |
| "Sally Mae" | Plaintiff/Stalls |
| "Crazy Horse" | Plaintiff/McQuaig |
| "Winter Hawk" | " |
| "Captain J.H." | Plaintiff/Foltz, as representative of the Morgan Estate |
| "Friskie" | " |
| "D B & S" | " |
| "R.A.M." | " |
| "Miss Sunbury" | " |
| "Rachel M." | " |
| "Key Wester" | Plaintiff/Foltz, as manager |
| "Lone Wolf" | ". |

2. All plaintiffs availed themselves of the opportunity to contest the fines specified in their respective Notices. The fines determined by the District Director following proceedings in accordance with 8 C.F.S. § 280 were as follows:

to imposition of One Thousand ($1,000.00) Dollar fines for each alien landed without a visa, 8 U.S.C. § 1323. Under date of June 25, 1980, as modified July 7, 1980, this Court granted plaintiffs a preliminary injunction against defendants whereby plaintiffs' 31 vessels were released from any prohibition on use in lawful domestic fishing or shrimping operations subject (A) to the posting of personal surety bonds in varying amounts collateralized by a security interest or lien on the particular vessel involved, running in favor of the United States of America; and (B) conditions designed to protect the interests of the United States with insurance coverage, nontransferability, use of the vessels, and otherwise. *Pollgreen v. Morris*, 496 F.Supp. 1042 (S.D.Fla.1980). This preliminary injunction was entered after a full-day evidentiary hearing.

Thereafter plaintiffs filed administrative appeals to INS and the Board of Immigration Appeals appealing fines levied under 8 U.S.C. § 1323. In the present posture of these cases, defendants have filed a Motion for Partial Summary Judgment with Supporting Memorandum of Law and a complete Administrative Record of Proceedings held before the Regional Director, Immigration and Naturalization Service and the Board of Immigration Appeals of the United States Department of State (I.N.S.) Washington, D.C., including, but not limited to all papers filed and submitted in each instance offered by an individual plaintiff, affidavits, exhibits and other supporting data. The plaintiffs responded by filing cross Motions for Summary Judgment, each respectively, together with supporting Memoranda of Law, references to the Administrative Record, affidavits, exhibits and other supporting data. This Court has heard extensive oral argument thereon and having now reviewed the entire record before this Court, including, but not limited to, the entire record in these Court proceedings, as well as all proceedings offered before INS and the Agency, the Court is satisfied that no disputed issues of material facts remain which would prevent the entry of a summary judgment if any party is

Note 2—Continued

| | | |
|---|---|---|
| Plaintiff Pollgreen | "Tom's Tub Too" | $ 30,000 |
| Plaintiff Roseman | "Rose Lee" | 51,000 |
| Plaintiff Hernandez | "Iraida" | 147,000 |
| Plaintiff Vasquez | "Father & Son" | 18,000 |
| Plaintiff Fernandez | "Captain Henry" | 226,000 and |
| | | 128,000 |
| | "Thunderbolt" | 224,000 |
| | "Skipper and David" | 72,000 |
| | "Kraut & Cracker" | 257,000 |
| Plaintiff Foltz | "Sun Hippie" | 30,000 and |
| | | 189,000 |
| | "Sun Lioness" | 134,000 |
| | "Miss To Nicey" | 232,000 |
| Plaintiff Pierce | "Christina-M" | 134,000 |
| Plaintiff Rego | "Melanie" | 20,000 |
| Plaintiff Trujillo | "Patsy Ann" | 230,000 and |
| | | 169,000 |
| Plaintiff Montague | "Terry Lynn" | pending |
| Plaintiff Hickman | "Lamanda Louise" | 244,000 |
| Plaintiff Weed | "Captain Jeffrey" | 178,000 |
| Plaintiff Knowles | "Red Cloud" | 161,000 |
| Plaintiff Clark | "D.J.&C." | 147,000 |
| Plaintiff Stalls | "Sally Mae" | 147,000 |
| Plaintiff McQuaig | "Crazy Horse" | 299,000 |
| | "Winter Hawk" | 207,000 |
| Plaintiff Foltz/as | "Captain J.H." | 10,000 |
| representative | "Friskie" | 167,000 |
| of the Morgan Estate | "D B & S" | 143,000 |
| | "R.A.M." | 217,000 |
| | "Miss Sunbury" | 222,000 |
| | "Rachel M." | 131,000 |
| Plaintiff Foltz, | "Key Wester" | 60,000 |
| as manager | "Lone Wolfe" | 176,000. |

entitled thereto as a matter of law, based upon said record.

### Undisputed Factual Background

The plaintiffs have further supported the factual basis offered to this Court at the hearing on preliminary injunction in *Pollgreen, supra,* by submitting additional affidavits and exhibits, as well as by reference to affidavits offered by each plaintiff separately and severally in the course of the Agency appeals. Those facts as evidenced even by the defendants' Statement of Material Facts submitted in support of defendants' Motion for Partial Summary Judgment, are undisputed as stated in *Pollgreen, supra,* at P. 1047:

"In early April, 1980, Cuban citizens numbering in excess of 10,800, who maintained that they were political refugees, sought sanctuary in the Peruvian Embassy in Havana. Recognizing 'that special conditions exist[ed]', President Jimmy Carter on April 14, 1980, determined that those persons in the Peruvian Embassy 'who otherwise qualify *may be considered refugees even though they are within their country of nationality or habitual residence*'. Furthermore, declaring 'that an unforeseen emergency *refugee* situation exists' President Carter concluded that 'grave humanitarian needs' and the 'national interest' justified the admission of up to 3500 of the refugees to this country and the appropriation of up to $4.25 million to aid in their resettlement pursuant to the Refugee Act of 1980. 45 Fed.Reg. 28079 (April 14, 1980). Through diplomatic efforts, an airlift was arranged to carry the Peruvian Embassy refugees from Havana to San Jose, Costa Rica. Once there, the refugees were to be processed for resettlement in the United States, Costa Rica, Peru and other Latin-American countries. After three days, the Cuban government halted the refugee flights. Whether cancellation of the flights acted as the catalyst is unclear from the record before the Court, but on April 19, 1980, small clusters of boats began to leave Key West, Florida for Mariel Harbor, Cuba to pick up refugees. The first boatloads returned from Mariel on April 21, foreshadowing the masses which followed—nearly 1800 boats carrying approximately 114,000 refugees.

"The government maintains that from the outset of the 'Freedom Flotilla' the public was warned that anyone traveling to Mariel to pick up refugees without valid visas would be subject to arrests and fines. Whether this position is substantiated by the record the Court need not say. Suffice it to note that whatever the government's enforcement posture was previously, President Carter raised serious questions on May 5, 1980, when asked what he intended to do 'about enforcing current immigration laws'. In response, the President promised '[w]e'll continue to provide an open heart and open arms to refugees seeking freedom from communist domination and from the economic deprivation brought about primarily by Fidel Castro and his government'. ¶ 28 Plaintiffs' Complaint, p. 10.

"On May 14, 1980, the President took affirmative steps to end the 'Freedom Flotilla' by imposing a blockade on outgoing vessels and ordering the return of U.S. vessels already at Mariel Harbor" [emphasis supplied]

### The Applicable Law

Although Notices of Seizure listed alleged violations of Title 8 United States Code §§ 1321, 1323 and 1324, the defendants have chosen to abandon claims under Section 1321, and have not asserted claims under Section 1324 although allegedly reserving the right to do so. Instead, the Notice of Fines and the seizures have been processed and founded upon Title 8 U.S.C. § 1323 which proscribes bringing into the United States any alien who does not have a required valid visa under penalty of assessment of a fine in the sum of One Thousand ($1,000.00) Dollars for each alien so brought.

At page 4 of the defendants' Reply Memorandum, the government states the fol-

lowing position with regard to the status of the Cuban nationals: " ... Moreover, the Cuban nationals who entered the United States during the so-called 'Cuban Flotilla' between April 21 and June 19, 1980 were paroled into the United States for a six-month period as 'Cuban entrants (status pending)', precisely because they did not possess refugee documents or any other entry documents." Whether the Cuban Nationals brought to Key West, Florida, by the plaintiffs during the Cuban Flotilla were parolees, non-resident aliens, refugees, or whatever their status, is neither relevant nor pertinent to the resolution of the pending Motions for Summary Judgment. Nor is it necessarily significant to observe that the Cuban nationals came here seeking political asylum and still seek that status today. What *is* pertinent and relevant are the circumstances, conditions and events immediately attendant, which precipitated these Cuban nationals being brought to the United States, in order to ascertain whether such bringing was "unlawful" and in violation of § 1323.

Plaintiffs have established conclusively a viable *uncontradicted* defense of duress and coercion for their actions, which renders seizure of their vessels improper and entitles them to mitigation of fines assessed under 8 U.S.C. § 1323.

... The testimony is uncontroverted that Plaintiffs intended to transport only a limited number of specified persons, mostly relatives and friends, all of whom Plaintiffs assumed had valid visas for entry into the United States. Despite these intentions, Plaintiffs were required by armed soldiers of the Cuban government to take on board their vessels other Cuban nationals, whether documented or not. Testimony adduced at the hearing indicates that Cuban gunboats in fact prevented Plaintiffs from departing Mariel Harbor without bringing back Cuban nationals whose entry into the United States would, under the applicable immigration laws, be illegal. For example, one of the Plaintiffs herein, who sought to pick up 20 family members, was forced to overload his vessel with 134

additional Cuban passengers. That some boats in the 'Freedom Flotilla' returned without illegal aliens aboard in no way bears upon the coercion to which *these* Plaintiffs were allegedly subjected. So too, the fact that Plaintiffs received money for the transportation of their Cuban passengers is irrelevant to the duress under which Plaintiffs acted in connection therewith."

[emphasis supplied]

*Pollgreen, supra,* at 1055.

Mariel Harbor was described in uncontroverted testimony as entrenched with gunboats and armed soldiers, which supports Plaintiffs' defense of duress, i.e. that the threatening conduct of Cuban armed forces produced in Plaintiffs a *reasonable* fear of immediate death, serious bodily harm to themselves or their passengers or forced detention. Typically the Affidavit submitted to the Immigration and Naturalization Service and the Board of Immigration Appeals, by plaintiff Timothy McQuaig (Vessel: Red Cloud, *See* Record of Motor Vessel Red Cloud), describes the situation prevailing at Mariel Harbor, to-wit:

" ... I was not prepared for the situation which we encountered upon our arrival in Mariel Harbor. After surveying the situation from afar, I decided to return to the United States. Upon attempting to leave the harbor, I was turned around by Cuban gunboats, and was informed that I must drop my anchor and wait for further instructions. I was told that if I made any more attempts to leave the harbor I would be stopped by the gunboats. Having no choice in the matter, we dropped our anchor. The Cuban-Americans aboard the boat furnished to the Cuban Authorities a list of their relatives who were supposed to have valid visas.

"I enlisted the services of a Cuban-American as an interpreter and went ashore in a small boat to talk to the Cuban Authorities at the loading dock. I again asked permission to return to the United States, but again I was told if I attempted to leave the harbor I would be stopped

by the gunboats. During the days that followed, Cuban soldiers, armed with guns, boarded and searched my boat. Numerous times I returned to shore and tried to explain that we were out of food and water and needed to return home. Each time I was warned not to try to leave. Upon contacting the American Interest Section, we were told to obey the orders of the Cubans, and not to try to leave against their orders.

"On May 12, 1980 I was called to the loading dock and the Cuban Authorities began loading my boat with relatives of the Cuban Americans. My Cuban interpreter told me that all except two of the Cuban Americans had their relatives on board and the relatives of these remaining two would not be allowed to leave Cuba because one was a doctor and the other was an engineer and they were needed in Cuba. At this time I requested that no more people be loaded onto my boat and that I be allowed to return to the U.S. A Cuban soldier held a gun on me and they continued to load people on my boat against my will.

"After loading all the people that they wanted on my boat they forced me to anchor up in the back of the harbor with what I was later told numbered 235 Cubans on board. We were without any food or water until the following day. Late on the day of May 13, 1980, we were allowed to leave Mariel Harbor and return to Key West. Several of the people on board were near death from hunger and the heat, and most likely would not have survived the traumatic experience had there not been a Cuban doctor who had somehow managed to get aboard the boat.

"We arrived in Key West on May 13, 1980, and immediately proceeded to the designated unloading facility set up by the U.S. Immigration.

"At no time did I have any intentions of bringing anyone into the United States illegally. When I departed from Key West, I was assured by the Cuban-Americans that we were going after people who had valid visas to enter this country, and I was under the impression that the United States was willing to accept these people. If I had known that I was going to be forced to bring illegal people back aboard my boat I never would have become involved. But at the time, I felt that it was a humanitarian cause to help a deserving people. It was a traumatic experience for me and I never intend to get involved in a similar situation again...".

Again and typically, the undisputed Affidavit of Donald Diehl, Sr. (Vessel: Key Wester, See Record of Motor Vessel, Key Wester), describes the situation as follows:

"... I arrived at Mariel April 25. I was met at the outside of the mouth of the harbor by a gunboat and escorted into the harbor and ordered to anchor. The vessel remained at anchor for 10 days, and then on the 10th day, a number of Cuban Immigration officials came aboard and asked for a list of the names of the relatives for whom we had come. Approximately on the 12th day and then again on the 14th day, the Cuban Immigration officials again came aboard to obtain the lists of the relatives for whom we had come.

"On approximately May 6, my vessel was ordered to the loading dock; however, upon tying up at the dock I was informed by Cuban officials that my vessel would not be permitted to take out of Cuba the named relatives. I then made protest, telling these Cuban officials that if I could not have the relatives for whom we had come, I would not take anyone. I was then advised in no uncertain terms that I was going to take a load of Cubans out of Cuba, whether or not I took the requested relatives. I was then ordered away from the dock, and ordered to remain at anchor until given further orders.

"On May 15, 1980, I heard from other fishermen that the President had made a statement ordering the vessels back to the United States without Cubans aboard. I therefore, on May 15, requested permission from the Cuban Immigra-

tion to depart Cuba in compliance with the Presidential order. This permission was denied. At the time that permission was denied, gunboats were patrolling constantly in the harbor, and were blockading the mouth of the harbor, preventing any American vessel from leaving. I personally saw a number of American vessels attempting to leave, and saw them turned around by gunboats and ordered to dock for the loading of refugees. I also heard rumors that vessels attempting to run the blockade were being fired upon ...".

There seems little doubt but that parties who participated in the Mariel boatlift had every reason to believe that at least until May 14, 1980, that no violation of United States policy or law was occurring by bringing the Cuban nationals into the United States. *See, United States v. Frade,* 709 F.2d 1387 (11th Cir.1983), at P. 1394–95:

"... Congressman Long testified that the priests 'wanted general information about making sure what the United States' policy was, to do it in accordance with the policy of the United States.' He stated that, at that time he 'was of the impression from the President's [May 5] statement ... that the United States was encouraging and welcoming' the boatlift.

.    .    .    .    .

"On May 5, 1980 at a press conference in Miami, the President responded to a question from a representative of the League of Women Voters with the statement:

'[L]iterally tens of thousands of others will be received in our country with understanding, as expeditiously as we can, as safely as possible on their journey across the 90 miles of ocean, and processed in accordance with the law .... But we'll continue to provide an open heart and open arms to refugees seeking freedom from Communist domination and from economic deprivation, brought about primarily by Fidel Castro and his government.'

*"The President's 'open heart and open arms' statement was broadly interpreted as governmental approval of the boatlift.*

"Then, *on May 14, 1980,* still maintaining that 'the United States will welcome Cubans, seeking freedom, in accordance with our laws, and we will pursue every avenue to establish an orderly and regular flow,' the President made the statement at issue here. White House Statement on Administration Policy Toward the Refugees of *May 14, 1980."* [emphasis supplied]

As can be observed from the foregoing, the President's "open heart and open arms" statement was widely publicized and broadly interpreted as Government approval of the boatlift. The Eleventh Circuit further observed:

"... But the import of the specific provision in subparagraphs (a) through (f), seen against the background of Mariel, as we understand it, is that the Administration would continue to welcome legitimate Cuban refugees, but would take firm coordinated action to prevent the two dangers which had emerged from the boatlift: death and injury at sea resulting from passage in unsafe vessels, and entry into the United States of Cuban undesireables forced onto the boats by the Castro regime."

*Frade, supra,* at page 1396.

Again, even though in the context of a criminal case, in *United States v. Zayas-Morales,* 685 F.2d 1272 (11th Cir.1982) wherein the Eleventh Circuit affirmed the dismissal of 84 indictments charging 336 defendants with substantive violation of 8 U.S.C.A. § 1324(a)(1), and with conspiracy to violate that statute, the Court stated, "We therefore affirm the dismissal based on the government's inability to prove the defendants possessed a general criminal intent under the stipulated facts".

This Court held in *United States v. Sanchez,* 520 F.Supp. 1038 (S.D.Fla.1981), *aff'd.,* 703 F.2d 580 (11th Cir.1983), a case similar to the instant proceedings, that the imposition of a fine as a penalty for viola-

tion of the law can be considered "quasi-criminal" in nature, stating:

"At the outset, the Court would note that while technically these cases are civil actions, the imposition of a fine as a penalty for violation of the law can be considered 'quasi-criminal' in nature. The term 'quasi-criminal' is not here used to imply that the full panoply of constitutional protections attendant to a true criminal proceeding should apply in this context. *United States v. Ward*, 448 U.S. 242, 100 S.Ct. 2636, 2640–41, 65 L.Ed.2d 742 (1980). It is well settled that Congress may provide for the imposition of a civil fine as a penalty for violation of a statute and this Court does not question that § 1323 is such an enactment. Indeed, no party has made the assertion that § 1323 should be considered as providing a criminal penalty under the standards set forth in *Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 168–69, 83 S.Ct. 554, 567–68, 9 L.Ed.2d 644 (1963). However, characterizing the sanction as civil does not alter the fact that a penalty is being imposed by the Government for violation of the law, and in these cases, a very severe penalty. The Court is hard pressed to find any other conduct which these Defendants might be accused of which could result in a fine of as much as $92,000. As such, this Court feels compelled to afford Defendants every opportunity to establish whatever defenses may exist, in law and fact, to the penalties imposed.

.         .         .         .         .

"It is the opinion of this Court that duress and coercion would at least provide a basis for mitigation in these cases, even though not expressly so provided in the statute. *Pollgreen, supra,* at 1055. It is a basic precept of the common law that a wrongful intent is an essential element of criminal liability, *Morissette v. U.S.*, 342 U.S. 246, 72 S.Ct. 240, 96 L.Ed. 288 (1952), and that if an act, otherwise unlawful, is done due to duress or coercion this element is lacking. *United States v. Bailey*, 444 U.S. 394, 100 S.Ct.

624, 62 L.Ed.2d 575 (1980). In *Furnish v. C.I.R.*, 262 F.2d 727 (9th Cir.1958), the Court held that a wife who signed a fraudulent joint tax return under duress from her husband would not be liable for civil penalties under the tax laws, even though the fact that the wife did not participate in or even know of the husband's fraud would not provide a defense. And, even where a statutory scheme does impose liability for civil penalties regardless of the actor's intent, *see Bailey, supra* 100 S.Ct. at 631 n. 4, his state of mind may still be considered in mitigation of the penalty. *Federal Election Commission v. Nat'l Ed. Ass'n.*, 457 F.Supp. 1102, 1112 (D.D.C.1978); *United States v. Barbacoff,* 416 F.Supp. 606 (D.D.C.1976)."

[emphasis supplied]

In an unpublished opinion affirming *United States v. Sanchez,* 520 F.Supp. 1038 (S.D.Fla.1981), the Eleventh Circuit did so "based upon and for the reasons set forth in that court's order denying plaintiffs' motions for summary judgment, a copy of which is attached". 703 F.2d 580 (11th Cir.1983). Therefore, the defense of duress and coercion has been recognized as a viable defense in the Eleventh Circuit and is directly available to the plaintiffs. They have asserted it here and the uncontroverted evidence in this record clearly establishes that these plaintiffs did act under duress and coercion in loading the Cuban nationals, leaving Mariel Harbor, and returning to Key West. So also it is available in mitigation of damages.

Later, herein, this Court in reviewing the Agency actions, will address as a separate and independent basis for the granting of relief, the arbitrary and capricious refusal of the Agency to afford that defense of duress and coercion as a complete defense and/or in mitigation of damages in a manner not discriminatory. Again, as will be observed later, even if this action is more appropriately a review of Agency action based on the Administrative Record, the Agency action is not in accordance with law. So as a matter of law, (a) these

plaintiffs are entitled to a summary judgment based upon duress and coercion and, (b) they are also entitled to relief if addressed upon the basis of a failure of Agency action to meet the necessary requirements of law on Agency review by the District Court.

### INS Agency Action

Under date of *September 3, 1980,* David Crosland, Acting Commissioner, INS, addressed a memorandum to the Regional Commissioner, Southern Region, regarding the Cuban Boatlift Program, Project 069, setting forth guidelines that were to be applied to events which had already occurred from April to June, 1980.[3] *On October 7, 1980,* David Crosland, Acting Commissioner, INS, addressed a memorandum to Durward Powell, Regional Commissioner, Southern Region, wherein he directed:

"The legal defenses of coercion and necessity should be specifically rejected. The law is clear that these defenses are not available if there was a reasonable, legal alternative to violating the law and thus to avoid the potential harm. *United States v. Bailey,* 100 S.Ct. 624, 635 (1980); see also *United States v. Richardson,* 588 F.2d 1235 (1978). In the instant fine cases, the boat operators knew they were violating the law when they traveled to Cuba for the purpose of bringing back undocumented aliens, and they thereby created the situation of potentially being forced to bring back additional aliens. The only situation in which coercion would be a valid defense is if the boat operator can prove he left to pick up only documented aliens and was forced to take back additional aliens. The boat operator would have the burden of proving that the aliens he went to get had documents."

(*See* Attachment 3 to Defendants' Memorandum in Support of Motion for Partial Summary Judgment.)

Typically, in the Opinion issued by the Board of Immigration Appeals under date of March 9, 1982 relating to the Motor Vessel/Lone Wolf, these statements appear with regard to the defense of duress and coercion:

"The carrier contends that he should not be liable for fines in this case because most of his passengers were forced upon his vessel by Cuban authorities and brought to the United States under duress. In *Matter of M/V 'Emma', supra,* we rejected duress as a defense to liability in these cases because section 273 is a strict liability statute and the fines are imposed without regard to the carrier's intentions. We have held that any bringing of an alien who does not have proper

3.　　　　　ATTACHMENT 1

Cuban Boatlift Program, Project 069

| Regional Commissioner | David Crosland |
|---|---|
| Southern Region | Acting Commissioner |

The following instructions and authorization relate to various aspects of the Cuban Boatlift Program, Project 069 at Miami.

*Fines*

The following guidelines will be followed when considering the imposition of fines under section 273(a) of the Act against persons bringing undocumented aliens from Cuba to the United States since April 21, 1980:

*Boat Departures from the United States Prior to Midnight, May 1, 1980*

(a) Fines will be imposed for each undocumented alien brought from Cuba to the United States whom the boat operator intended to bring to the United States when he departed for Cuba prior to midnight, May 1, 1980. In determining this number, factors such as the size of the boat and the amount of provisions aboard should be considered in evaluating the carrier's claim.

(b) Where a defense has been filed claiming duress or coercion the carrier will be interviewed under oath by an immigration officer to determine if the carrier was in fact coerced by the Cuban authorities into bringing additional aliens into the United States. If the immigration officer finds that such coercion did in fact take place, fines will be cancelled in full, as an exercise in prosecutorial discretion, for the number of aliens in excess of the number the carrier originally intended to bring. However, if the immigration officer finds that the carrier transported aliens to the United States for profit, the fines will be imposed for all undocumented aliens brought to the United States.

*Boat Departures from the United States after Midnight, May 1, 1980*

(a) Fines against carriers will be imposed in full for all undocumented aliens brought to the United States on boats which departed the United States after midnight, May 1, 1980.

documents incurs liability. *See also Matter of M/V 'Solemn Judge', supra; Matter of Swissair 'Flight # 164', supra; cf. Elting v. North German Lloyd,* 287 U.S. 324 [53 S.Ct. 164, 77 L.Ed. 337] (1932); *Hamburg-American Line v. United States,* 291 U.S. 420 [54 S.Ct. 491, 78 L.Ed. 887] (1934) (1924 statute—forerunner of the present section 273).

.    .    .    .    .

"The carrier also contends that there is legal precedent to establish that the forced loading of the allegedly illegal aliens onto his boat was in fact an act of duress which must be considered as a mitigating factor in assessing the fines. The legal precedent to which the carrier refers is *Pollgreen v. Morris,* 496 F.Supp. 1042 (S.D.Fla.1980). We do not find the court's comments in *Pollgreen* regarding duress to control the disposition of the duress issues we face in this case. The court's comments about duress in that case were made in the course of finding that the plaintiffs had established a likelihood of success on the merits in their cases, which the court noted was one of the elements necessary for the court to issue an injunction. Thus,

the court's findings with respect to duress were preliminary and not final and are not binding in this case. While duress is normally available in both criminal and civil cases, we have held that it is not available to avoid liability in these fine cases because section 273 of the Act imposes strict liability upon those who bring to the United States aliens who need, but do not have, visas. *Matter of M/V 'Emma', supra; Matter of Swissair 'Flight # 164', supra.* We have further held that the defense of duress as argued in this case does not entitle the carrier to remission. *Matter of M/V 'Solemn Judge', supra.* We reach the same conclusion here for the reasons set forth in the cases cited."

This law was generally applied in all cases herein appealed to INS.

Additionally, by guidelines and/or regulations adopted subsequent to the occurrences, the Agency arbitrarily undertook, in the name of "prosecutorial discretion", to cancel certain fines in certain situations. It therefore reduced the fines in a number of instances wherein departures from Key West occurred prior to May 1, 1980 [4] and

**4.** Plaintiffs' vessels departed Key West, Florida, for Mariel, Cuba, on or about the following dates:

| | | |
|---|---|---|
| "Tom's Tub Too" | April 30, 1980 | Plaintiff/Pollgreen |
| "Rose Lee" | April 29, 1980 | Plaintiff/Roseman |
| "Iraida" | May 8, 1980 | Plaintiff/Hernandez |
| "Father and Son" | April 24, 1980 | Plaintiff/Vasquez |
| "Captain Henry" | April 23, 1980 and May 4, 1980 | Plaintiff/Fernandez |
| "Thunderbolt" | May 5, 1980 | " |
| "Skippie and David" | April 28, 1980 | " |
| "Kraut and Cracker" | May 5, 1980 | " |
| "Sun Hippie" | -undetermined- and April 30, 1980 | Plaintiff/Foltz |
| "Sun Lioness" | April 26, 1980 | " |
| "Miss To Nicey" | April 27, 1980 | " |
| "Christina-M" | April 26, 1980 | Plaintiff/Pierce |
| "Melanie" | -unknown- | Plaintiff/Rego |
| "Patsy Ann" | April 25, 1980 and May 5, 1980 | Plaintiff/Trujillo |
| "Terry Lynn" | April 24, 1980 | Plaintiff/Montague |
| "Lamanda Louise" | April 29, 1980 | Plaintiff/Hickman |
| "Captain Jeffrey" | -unknown- | Plaintiff/Weed |
| "Red Cloud" | April 26, 1980 | Plaintiff/Knowles |
| "D.J.&C." | May 7 or 8, 1980 | Plaintiff/Clark |

related, to the satisfaction of INS, that the vessel captain/owner intended only to bring a certain number of documented aliens back to Key West when he left that port.[5] These guidelines are arbitrary and capricious, were adopted after the events, and without the vessel owners having been placed upon prior notice at the time of the occurrences.

Defendants argue at page 16 of their Memorandum in Support of their Motion

Note 4—Continued

| | | |
|---|---|---|
| "Sally Mae" | April 27, 1980 | Plaintiff/Stalls |
| "Crazy Horse" | April 26, 1980 | Plaintiff/McQuaig |
| "Winter Hawk" | April 25 or 26, 1980 | " |
| "Captain J.H." | April 23, 1980 | Plaintiff/Foltz as representative of the Morgan Estate |
| "Friskie" | April 26, 1980 | " |
| "D B & S" | April 26, 1980 | " |
| "R.A.M." | April 25 or 26, 1980 | " |
| "Miss Sunbury" | April 25, 1980 | " |
| "Rachel M." | April 24, 1980 | " |
| "Key Wester" | April 24, 1980 | Plaintiff/Foltz as manager |
| "Lone Wolf" | April 26, 1980 | " . |

5. After embarking said undocumented Cuban nationals, plaintiffs' vessels returned to the United States and arrived in Key West, Florida, on or about the following dates:

| | | |
|---|---|---|
| "Tom's Tub Too" | May 19, 1980 | Plaintiff/Pollgreen |
| "Rose Lee" | May 18, 1980 | Plaintiff/Roseman |
| "Iraida" | May 20, 1980 | Plaintiff/Hernandez |
| "Father and Son" | May 19, 1980 | Plaintiff/Vasquez |
| "Captain Henry" | May 2, 1980 and May 21, 1980 | Plaintiff/Fernandez |
| "Thunderbolt" | May 28, 1980 | " |
| "Skippie and David" | May 19, 1980 | " |
| "Kraut and Cracker" | May 29, 1980 | " |
| "Sun Hippie" | April 29, 1980 and May 22, 1980 | Plaintiff/Foltz |
| "Sun Lioness" | May 27, 1980 | " |
| "Miss To Nicey" | June 9, 1980 | " |
| "Christina-M" | May 16, 1980 | Plaintiff/Pierce |
| "Melanie" | April 26, 1980 | Plaintiff/Rego |
| "Patsy Ann" | May 7, 1980 and May 26, 1980 | Plaintiff/Trujillo |
| "Terry Lynn" | unknown | Plaintiff/Montague |
| "Lamanda Louise" | June 2, 1980 | Plaintiff/Hickman |
| "Captain Jeffrey" | June 6, 1980 | Plaintiff/Weed |
| "Red Cloud" | May 13, 1980 | Plaintiff/Knowles |
| "D.J.&C." | June 13, 1980 | Plaintiff/Clark |
| "Sally Mae" | May 22, 1980 | Plaintiff/Stalls |
| "Crazy Horse" | May 9, 1980 | Plaintiff/McQuaig |
| "Winter Hawk" | May 23, 1980 | " |
| "Captain J.H." | April 27, 1980 | Plaintiff/Foltz as representative of the Morgan Estate |
| "Friskie" | May 22, 1980 | " |
| "D B & S" | May 20, 1980 | " |
| "R.A.M." | May 22, or 28, 1980 | " |
| "Miss Sunbury" | May 22 or 28, 1980 | " |
| "Rachel M." | June 3, 1980 | " |
| "Key Wester" | May 16, 1980 | Plaintiff/Foltz as manager |
| "Lone Wolf" | June 3, 1980 | ". |

for Partial Summary Judgment that, "Here, the Board considered the question of whether duress may provide a defense to a section 273 violation and properly rejected it as contrary to legal precedent, both judicial and administrative, and as contrary to Congressional intent. *See, e.g.,* Administrative Record, *M/V "Crazy Horse",* decision of Board at pp. 2–3. The Board's decision, being in accordance with the law, and not arbitrary or capricious, must be sustained." *See,* also, p. 22 of the same Memorandum of Law, f.n. 13, wherein government counsel argues, "Defendants respectfully submit that the Court erred on the issue of duress in both *Sanchez* and its June 1980 decision in the present controversy. For the reasons discussed in Section IV A. and B. of the text, the defense of duress is not applicable to a violation under section 273 of the Act—either as a complete defense or to mitigate fines."

Again at p. 23 of the same Memorandum, government counsel argues that, "The Service, in exercising its prosecutorial and statutory discretion to reduce or cancel fines, has considered all of the proffered evidence in each case and has made a reasoned determination as to the particular circumstance pertinent to each violation of the Act (*e.g.,* whether the vessel in question went to Cuba for profit motives). *See United States v. Barbacoff,* 416 F.Supp. 606, 610 (D.D.C.1976)." At f.n. 14, the Court is informed that, "In exercising its prosecutorial discretion, the Service followed the government's internal guidelines in deciding to cancel hundreds of thousands of dollars worth of fines." These *internal guidelines* were referred to by this Court in *Sanchez, supra,* at 1041. They are not officially promulgated rules and regulations and do *not* appear in the Code of Federal Regulations or the Federal Register, but are merely guidelines similar to that set forth in footnote 3 hereof. *See* also, *Sanchez, supra,* at 1041, including unnumbered footnote. Again, it was adopted several months following the occurrences charged against these plaintiffs.

In a Petition for Rehearing and Petition for Rehearing En Banc in *United States v. Sanchez,* 709 F.2d 1353 (11th Cir.1983), the Eleventh Circuit in ruling thereon held:

"The Petition for Rehearing, insofar as the same is addressed to the panel, is DENIED. A review of the record and the briefs, along with statements made by counsel during oral argument, convinces us that it would have been *absolutely futile* for the appellees to have raised a claim of duress or coercion in the administrative proceedings."

[emphasis supplied]

How prophetic that holding was. In reviewing the manner in which INS and the Board of Immigration Appeals treated the duress and coercion issues, the reviewing court is limited to whether the Agency's findings and conclusions were "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law" or "in excess of statutory jurisdiction, authority, or limitations". 5 U.S.C. § 706(2)(A) and (C); *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971); *Camp v. Pitts,* 411 U.S. 138, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973); *Florida Department of Health, etc. v. Califano,* 449 F.Supp. 274 (N.D.Fla. 1978), *aff'd.,* 585 F.2d 150 (5th Cir.1978) (denying the State of Florida a *de novo* trial). A reviewing court must:

"consider whether the [agency's] decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment .... Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency."

*Citizens to Preserve Overton Park, supra,* 401 U.S. at 416, 91 S.Ct. at 823.

It is apparent that the Agency's findings and conclusions in the various administrative proceedings were arbitrary, capricious and constituted an abuse of discretion and were not rendered in accordance with law. The very record before the Board of Immigration Appeals and/or the Agency in each

instance clearly supported the applicability of the defense of duress and coercion directly or through mitigation of fines as a matter of law. The failure to apply same in accordance with clear standards/regulations and/or statutory law was arbitrary, capricious, not in accordance with law, and an abuse of discretion rising to the level supporting the relief sought here. The record itself does not sustain any finding supporting the results and findings announced by the Agency in each instance. *See* also, *Motor Vehicle Mfrs. Ass'n. v. State Farm Mutual*, —— U.S. ——, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983). The Agency has entirely failed to consider an important aspect of the problem, namely, duress and coercion as it affects intent and the resultant lawfulness of the transportation of the Cuban nationals.

*Conclusion*

As this Court observed in *Pollgreen, supra,* at 1049,

> "At root, the controversy here reflects a basic contradiction between, on the one hand, America's tradition of providing sanctuary for the homeless, the outcast and, particularly, the political refugee and, on the other, our immigration laws. That tension finds expression in the discomfiting question of who, and how many, can come to this country and in what circumstances. Resolution of that tension through promulgation and enforcement of a *coherent* immigration policy is a matter within the province of the Legislative and Executive Branches of government. This Court has neither the willingness nor the competence to interject itself into the arena of immigration policy, except insofar as such a policy runs afoul of constitutional and statutory safeguards, as is the case here."

[emphasis supplied]

The ruling made herein applies to a narrow set of circumstances and occurrences which under the most remote conditions would never again likely be duplicated. Here (a) the manner in which the emergency refugee condition was addressed by the President of the United States, the Executive Branch, the publicity generated by the media, and the manner or method by which policy was communicated, are not likely to be repeated in the same terms or with the same invitation—"Open Arms" policy; and, (b) the forcible exodus under threat of force and duress at Mariel would not again forseeably be allowed to constitute the basis for thrusting upon this Country thousands of refugees without regard to a predetermined plan/policy to address such events. No criticism is made or offered in terms of the decisions by President Carter to welcome the Cuban refugees, and, contrary-wise, the humanitarian aspects of what the President did and what was intended should be commended. However as earlier observed, it is not for the Courts either to attempt to make policy or to effectuate it. For what occurred, America is a greater nation. The manner in which the Cuban nationals were received, having been victimized by the Castro government, and being the pawns of the Cuban Freedom Flotilla, is stark evidence of that humanitarian quality which separates the United States of America from the chains imposed by those countries wherein freedom to pursue life, liberty and enjoy the fruits thereof is subjugated to the whim of the government. It remains for the Legislative and/or Executive Branch to address the permanent manner in which these Cuban nationals are to achieve status, if any, and if ever. It is not within the prerogative of the Court to confer status. This Opinion and this ruling therefore is addressed solely and specifically to the particular and special circumstances surrounding and attendant to the "Cuban Refugee Freedom Flotilla" of 1980, and is not and should not constitute the basis for support of future events which are unlikely ever to occur in like circumstances. It is thereupon

ORDERED AND ADJUDGED as follows:

1. Defendants' Motion for Partial Summary Judgment be, and the same is hereby DENIED;

2. Plaintiffs' Motions for Summary Judgment are hereby GRANTED, and Plaintiffs' Prayer for release and discharge from constructive seizure of all vessels seized hereunder, a discharge of each and

every bond and/or sureties thereon, and the release of conditions previously imposed by the Preliminary Injunction herein are hereby GRANTED. Therefore, the Preliminary Injunction will be made permanent insofar as it is ordered and directed that each of the vessels constructively seized herein shall be forthwith returned to the rightful owner/plaintiff free and clear of all leins and claims arising out of this litigation. It is hereby declared that the seizures herein and the fines imposed under 8 U.S.C. § 1323 were unlawfully made and imposed under the facts and circumstances attendant hereto. Each party shall bear its/his own costs.

3. A Final Judgment shall be entered herein reflecting the foregoing.