Richard **BRULAND**, Raymond Bruland, Vance Hager, and William Baldwin, Plaintiffs,

v.

Joe D. **HOWERTON**, et al., Defendants.

No. 84–0240–CIV–NESBITT.

United States District Court, S.D. Florida, Miami Division.

March 27, 1985.

Alfred K. Frigola, Marathon, Fla., for plaintiffs.

Robert Kendall, Jr., U.S. Dept. of Justice, Washington, D.C., Tammy Fox Isicoff, U.S.I.N.S., Miami, Fla., for defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

NESBITT, District Judge.

THIS CAUSE came before the Court upon a suit for declaratory and injunctive relief, seeking to prevent the enforcement and collection of fines assessed against the Plaintiffs by the United States Immigration and Naturalization Service (hereinafter "INS") for their violation of 8 U.S.C. § 1323 by bringing undocumented aliens to this country from Cuba during the so-called "Mariel boatlift." This suit was brought after the decisions of the INS District Director were affirmed by the Board of Immigration Appeals. The Court heard the matter non-jury and after due consideration of the administrative record below and the evidence and testimony presented at trial, the Court makes the following findings of fact and conclusions of law.

### FINDINGS OF FACT

The Plaintiffs in this action are four fishermen who transported Cuban nationals from Mariel, Cuba to this country during April and May 1980. Plaintiff RICHARD BRULAND is the owner of the three vessels involved in this case, and Plaintiffs RAYMOND BRULAND, VANCE HAGER, and WILLIAM BALDWIN were the captains of the three vessels which brought back aliens from Mariel harbor. Plaintiff WILLIAM BALDWIN failed to appear for the trial of this cause, and his claims were dismissed with prejudice at the commencement of the trial on September 17, 1984.

The Defendants were at all times relevant officials of the INS and the United States Customs Service (hereinafter "Customs"), including the District Director of the INS, JOE D. HOWERTON.

All three of the vessels involved in this action departed from Florida on April 25, 1980, intending to go to Mariel, Cuba. The Plaintiffs testified that they made the voyages at the request of certain Cuban-Americans who were seeking to pick up relatives and/or friends seeking to leave Cuba. These Cuban-Americans accompanied the vessels to Cuba, and agreed to make certain payments to the Plaintiffs to compensate them for making the trip by an advance cash payment, and an additional payment upon arrival of the relatives and friends on Plaintiffs' vessels. It is undisputed that none of the Plaintiffs ever sought or received permission from any official of INS, Customs, or the United States Coast Guard to make the trip to Mariel and bring back any Cuban nationals to this country.

The Plaintiffs testified that they attempted to determine whether it was legal to go to Mariel and bring back Cuban nationals to this country. They stated that they made the voyages only after they had satisfied themselves that it was in fact permissible to go and bring back Cubans from Mariel.

However, the Plaintiffs also admitted that none of them ever even attempted to contact either Customs or the INS to check on the legitimacy of their intended mission. Rather, they relied on the fact that other fishermen in Marathon, Florida reportedly said that it was permissible to transport persons from Cuba to the United States. As well, the Plaintiffs stated that they relied on the advice given by Ms. Cathy Gaines, a secretary at the Keys Fisheries, Inc. in Marathon. The Plaintiffs testified

**336**

that Gaines made the general announcement that she had contacted the Customs office in Marathon and had been told that there was no problem with the boats going to Mariel to pickup Cuban nationals, and that the captains needed only to fill out certain forms before and after the trip to insure the legality of their actions.

The testimony of the Customs Service officers who appeared at the trial of this cause tells a far different story than the one told by the Plaintiffs. The Customs officials stated that no one was told that it was legal to go to Mariel to bring back Cuban nationals. As well, there was testimony indicating that an official written INS warning to captains and owners was published on April 23, 1984, and was posted at the Customs office in Marathon on April 24, 1984, before the departure of the Plaintiffs' vessels. Finally, each of the Customs inspectors testified that all vessel owners and captains who sought Customs clearance to Mariel were advised of the INS warning.

Reviewing the weight of the evidence and testimony presented as well as the credibility of the various witnesses, the Court finds that none of the Plaintiffs ever received permission from any Government official, including Customs officers and INS representatives, prior to departing for Mariel, on April 25, 1980. Additionally, the Court takes into account the fact that the Plaintiffs neither presented Cathy Gaines as a witness at trial nor explained why she did not appear, despite the fact that she formed the basis for their belief that their voyages to Mariel to retrieve Cubans were legal.

█ The Plaintiffs also stated that they believed that the Coast Guard was giving tacit approval to those returning with Cuban nationals picked up at Mariel, since the Coast Guard was in fact assisting vessels in distress, and also enlisting other private vessels to help vessels overloaded with Cuban nationals being brought back from Mariel.

However, Lt. Commander Kenneth Gray of the Coast Guard testified that it was the mission and duty of the Coast Guard to attempt to assist vessels in distress, regardless of the legality of the voyages which those vessels may have undertaken. Thus, the fact that the Coast Guard did in fact assist other vessels laden with Cuban nationals brought back to this country from Mariel is completely irrelevant to the Plaintiffs' claims, and could have formed no reasonable basis for the Plaintiffs to believe that they were indeed acting within the law in going to Mariel and bringing back Cuban nationals.

It is very important to point out that none of the Plaintiffs attempted to determine the conditions inside Mariel harbor before they actually arrived there. Nor did they even attempt to find out whether they would be allowed to pick up the Cubans they were going for. They simply set off for the harbor of a hostile nation, a nation they knew was a Communist military dictatorship from which people were desperately trying to escape. In fact, Plaintiffs RAYMOND BRULAND and VANCE HAGER both admitted that they observed Cuban gun boats and helicopters on patrol before they actually entered Mariel harbor. Despite these warning signs, the Plaintiffs went into the harbor.

After entering the harbor, the Plaintiffs proceeded to dock their vessels and they attempted to locate the Cuban nationals whom they had come to pick up. At this point, the Plaintiffs realized that the Cuban government was requiring other American vessels to take on large numbers of unwanted Cuban nationals. Plaintiff RAYMOND BRULAND radioed instructions to his captains to return to Florida, but Plaintiffs RICHARD BRULAND and VANCE HAGER testified that they were unable to leave the harbor without taking on a load of Cubans. Although none of the Plaintiffs' vessels attempted to leave unloaded, they testified that they saw other American boats forcibly turned back to the docks when they did attempt to leave unloaded.

Finally, the Plaintiffs' vessels were loaded by the Cuban government, and they returned to Key West, Florida. The M/V

"Lady Violet" returned on May 4, 1980 with some 85 undocumented Cuban nationals aboard, the M/V "Captain Ray" returned on May 4, 1980 with 92 undocumented Cuban nationals aboard, and the M/V "Fern Elinore" returned on May 16, 1980 with 178 undocumented Cuban nationals aboard.

Based on the facts set out above, the INS served Notices of Intent to Fine pursuant to 8 U.S.C. § 1323 on each of the Plaintiffs. The fine was to be One Thousand Dollars ($1,000.00) for each alien brought into the United States without proper entry documentation, and the fine was to be imposed against both the captain and the owner of the vessel on which those aliens were brought in. Accordingly, RAYMOND BRULAND, captain of the "Captain Ray" was served with a $92,000 Notice; VANCE HAGER, captain of the "Lady Violet" was served with an $85,000 Notice; and WILLIAM BALDWIN, captain of the "Fern Elinore" was served with a $178,000 Notice. As well, as owner of all three vessels in issue, RICHARD BRULAND was served with three notices, $92,000 for the "Captain Ray", for $85,000 for the "Lady Violet", and for $178,000 for the "Fern Elinore".

After being served with the Notices of Intent to Fine, the Plaintiffs were accorded all of the rights to which they were entitled within the regulatory framework surrounding the enforcement of 8 U.S.C. § 1323 by the INS. The Plaintiffs all took advantage of their opportunity to present written statements opposing the Notices of Intent to Fine, and they all also appeared personally before an INS officer, to present mitigating factors in opposing the assessment of the fines against them.

After being allowed to present their written and oral objections and evidence, the District Director of the INS, Defendant HOWERTON, entered Final Decisions in all four of the Plaintiffs' cases. These Final Decisions were procedurally correct, being in writing with included discussion of the facts and law relied on by the District Director. The fines arising from the voyages of the "Fern Elinore" and "Lady Violet" were sustained in full, while the fine arising from the voyage of the "Captain Ray" was reduced to $34,000, based on the number of Cubans the "Lady Violet" had intended to pick up, rather than the number actually returned. The District Director did not exercise his prosecutorial discretion to reduce the other fines because he believed that the voyage of the "Captain Ray" was the only one of the three voyages involved herein which was not profit motivated.

All the Plaintiffs appealed the Final Decisions to the Board of Immigration Appeals, which dismissed the appeals and sustained in full all the fines imposed except for those in connection with the "Lady Violet". Due to a documentation problem, the fines arising from that voyage were reduced to $84,000. It is from these decisions that the Plaintiffs filed their suit for declaratory and injunctive relief.

## CONCLUSIONS OF LAW

The Plaintiffs in this case are challenging the results of the INS administrative proceedings whereby fines were levied against them. The Court has authority to review the decision of the INS pursuant to 5 U.S.C. § 704, but its scope of review is limited to determining whether the INS's actions were arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. In making this decision, the Court considers:

> whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment. Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency.

*Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 824, 28 L.Ed.2d 136 (1971). Although in this case the Court has heard additional live testimony and received evidence at trial, to be considered in addition to the administra-

tive records pertaining to the INS's action against these Plaintiffs, the standard of review to be applied remains the above-described abuse of discretion standard.

The Plaintiffs rely on three arguments in attempting to avoid the fines imposed. They claim that the government's actions during the events in question estop the INS from collecting these fines; that the defense of duress and coercion applies since the Cuban authorities forced them to load their boats with unwanted Cuban nationals; and, that failing these defenses, that the INS should have used its discretion to remit the fines based on the Plaintiffs' exercise of due diligence as set forth in 8 U.S.C. § 1323(c).

The Defendants take the position that the INS action must be affirmed within the limited scope of review available to this Court, as clearly being both supported by the facts on the record and as a proper application of the law to those facts. At the administrative level, the defenses of duress and estoppel were rejected as not established by the facts, and the INS and Board of Immigration Appeals both refused to remit the fines imposed. The Defendants assert the additional claim that the defense of duress is not even applicable to a violation of 8 U.S.C. § 1323, and that even if it had been established, that factor would be irrelevant to a determination of the Plaintiffs' liability.

Initially, the Court is aware of the fact that the Plaintiffs have not challenged the applicability of 8 U.S.C. § 1323 to this action. Nor did they (or could they) contest the establishment of a *prima facie* case against them for violating the statute. Clearly, 8 U.S.C. § 1323(a) makes it unlawful to bring an alien without an unexpired visa to this country, and 8 U.S.C. § 1323(b) provides for the imposition of a fine of $1,000 for each illegal alien so transported, said fine to be imposed against both the captain and the owner of the vessel on which the alien was brought in. Further, 8 U.S.C. § 1323(c) allows for remission of the fine if prior to departure from the last foreign port before coming to this country, the captain and/or owner did not know and could not have ascertained by exercise of due diligence, that the persons transported were aliens for whom visas were required.

Having reviewed the evidence at trial and the record below, the Court concludes that the Plaintiffs did in fact violate 8 U.S.C. § 1323 by bringing undocumented Cuban nationals to this country. As well, the Court concludes that the Plaintiffs were accorded all their procedural entitlements before the INS and the Board of Immigration Appeals, such as would allow the Court to sustain the Final Decisions of the District Director and the Board. The only question for serious consideration by this Court is whether the INS decision rejecting the Plaintiffs' proferred defenses was arbitrary, capricious, or an abuse of discretion.

The Plaintiffs' estoppel argument is based on their allegations that certain government officials in both the Customs Service and the Coast Guard were giving approval to and actually encouraging people to make the trip to Mariel to bring back Cubans. The District Director rejected this defense as not established by either fact of law, and having reviewed the record below and considered the testimony given at trial, the Court finds that this decision should be affirmed, as a proper application of the law to the facts as found by the District Director.

This case involves the government, acting through the INS, acting in its sovereign, as opposed to its proprietary, capacity. In this role, it is still questionable whether the government can ever be subject to a defense of estoppel, even where "affirmative misconduct" by the government is established. *Federal Deposit Insurance Corporation v. Harrison*, 735 F.2d 408 (11th Cir.1984); *Deltona Corporation v. Alexander*, 682 F.2d 888 (11th Cir.1982).

■ In a recent case involving an estoppel claim against the INS, based on alleged unreasonable delay in the processing of a citizenship application, the United States Supreme Court stated that:

the evidence that the Government failed to fulfill its duty in this case is at best questionable. The only indication of negligence is the length of time that the INS took to process respondent's application. Although the time was indeed long [18 months], we cannot say in the absence of evidence to the contrary that the delay was unwarranted.

* * * * * *

This case does not require us to reach ... whether affirmative misconduct in a particular case would estop the Government from enforcing the immigration laws. Proof only that the Government failed to process promptly an application falls far short of establishing such conduct.

*I.N.S. v. Miranda,* 459 U.S. 14, 18–19, 103 S.Ct. 281, 283–284, 74 L.Ed.2d 12 (1982).

As *Miranda* makes clear, a claim of estoppel against the INS in this setting should not even be considered unless the claimant establishes the threshold fact of affirmative misconduct on the part of the government. And as interpreted by the Court of Appeals for the Eleventh Circuit, the anticipated affirmative misconduct must amount to more than mere "silence, acquiescence, or even negligence". *Deltona Corporation v. Alexander, supra* at 892, n. 6.

In this case, the Court has found that none of the Plaintiffs sought governmental approval for their voyages to Mariel, and also that the Customs and INS officials were in fact warning people not to go to Mariel for the purpose of bringing back Cuban nationals. Accordingly, the Court concludes that there was no affirmative misconduct by any government agency, and as such, the District Director was correct, and was in fact compelled to reject the Plaintiffs' proferred defense of estoppel against the government and the Defendants.

In rejecting the proferred defense of estoppel, the Court takes note of the decision in *Lyden v. Howerton,* Case No. 83–2682–CIV–JLK (S.D.Fla. June 28, 1984), where Chief Judge King held the government to be estopped from collecting INS fines imposed against other captains and boat owners who had transported Cuban nationals from Mariel to this country. In the *Lyden* case, the court found that there was affirmative misconduct by the government, to the extent that certain of the plaintiffs therein had been encouraged and assisted by Customs officers in setting out for Mariel to pick up Cubans. This Court reaches a result contrary to that in *Lyden* due to the differing findings of fact concerning the conduct of government officials at Marathon and Key West.

The Plaintiffs have also attempted to rely on a defense of duress and coercion, claiming that they only brought back the undocumented aliens after they were forced to by the Cuban authorities as a condition for being allowed to leave Mariel harbor. To this effect, the Plaintiffs testified to the show of military force displayed by the Cuban government in the harbor.

Initially, the Defendants took the position that duress was not available as a defense to a violation of 8 U.S.C. § 1323. As well, the Defendant urged that the Court affirm the finding of the District Director, who rejected the claim of duress and coercion after reviewing the claim on its substantive merits.

Two other Divisions within this District have accepted the defense of duress and coercion raised by captains and owners who went to Cuba during this period and brought back boatloads of undocumented Cuban nationals. *Lyden v. Howerton, supra; Pollgreen v. Morris,* 579 F.Supp. 711 (S.D.Fla.1984). However, the Court of Appeals for the Eleventh Circuit only recently spoke to the applicability of the duress defense in connection with an alleged violation of 8 U.S.C. § 1323.

The issue was addressed, albeit indirectly, in *United States v. Blanco,* 754 F.2d 940 (11th Cir.1985). The *Blanco* case dealt with a boat captain who had gone to Mariel and brought back undocumented Cubans during the same time period as the instant case, the spring of 1980. The Court of

Appeals reversed the district court's findings that duress and coercion had been established as a defense to the imposition of fines by the INS. The appeals court relied on the fact that the captain has recklessly or negligently placed himself into a setting where it was likely that he would in fact be subject to duress to bar his use of that defense.

The *Blanco* case is helpful on two issues. First, it provides a current and concise analysis and application of the law regarding duress to the situation before this Court. Secondly, it also resolves the issue of whether duress is even available as a defense to an INS fine proceeding under 8 U.S.C. § 1323. Although the opinion did not address this issue directly, implicit in its holding is the finding that the defense was available but not warranted under the particular facts and circumstances of the *Blanco* record.

 Accordingly, this Court will proceed to review the merits of the Plaintiffs' duress and coercion claims. In order to establish the defense of duress, the Plaintiffs, must show that they:

> performed the unlawful act because (1) [they were] under an immediate threat of death or serious bodily injury, (2) [they] had a well grounded fear that the threat would be carried out, and (3) [they] had no reasonable opportunity to escape.

*United States v. Blanco, supra* at 943; *United States v. Shapiro,* 669 F.2d 593 (9th Cir.1982). After reviewing these factors, the Court must then consider the conduct of the Plaintiffs, since:

> [a] claim of duress and coercion will not afford a valid excuse when [one] has recklessly *or negligently* placed himself in a situation in which it was probable that he would be subject to duress. (Emphasis added.)

*United States v. Blanco, supra* at 943 *citing United States v. Agard,* 605 F.2d 665, 667 (2d Cir.1979).

 Reviewing the case before the Court, it is unnecessary to consider whether the Plaintiffs were in fact subject to duress or coercion exerted by the Cuban government, because the Plaintiffs' own conduct bars them from availing themselves of the defense.

As the Court previously found, none of the Plaintiffs attempted to determine the conditions at Mariel at any time prior to entering the harbor. Aware that they were sailing to a hostile nation controlled by a Communist military dictatorship, they entered the harbor despite the fact that they saw gun boats and helicopters on patrol while they were still outside of the harbor. Based on these facts as found, it cannot be contested that the Plaintiffs were at least negligent, if not clearly reckless, in entering Mariel harbor. Because the Plaintiffs negligently or recklessly placed themselves in a position where it was probable that they would be subject to duress at the hands of the Cuban government, the defense of coercion and duress is not available to these Plaintiffs, and the District Director was correct in sustaining the fines imposed by the INS against the Plaintiffs.

 The final defense raised by the Plaintiffs is that of "due diligence" as set out in 8 U.S.C. § 1323(c). At trial, the Plaintiffs attempted to establish either that they believed the Cubans they took on board had the proper visas, or that they believed that in fact visas were not required.

The remission provision of § 1323(c) is clearly not applicable in this case. The Plaintiffs made no serious effort to determine whether Cubans taken on board did or did not have proper visas. The fact was that by their own testimony, the Plaintiffs made it clear that they had no control over who was loaded or not loaded. As for their belief that visas were not required for the Cubans brought back, their belief is completely irrelevant, as 8 U.S.C. § 1323 is in effect a strict liability provision against those who transport undocumented aliens to this country. Accordingly, the District Director properly rejected the Plaintiffs' requests for remission of the fines imposed under the "due diligence" defense.

## CONCLUSION

For the reasons set out by the Court in the above findings of fact and conclusions of law, the Court finds that the Final Decisions of the District Director of the INS as modified by the Board of Immigration Appeals should be AFFIRMED, and judgment entered in favor of the Defendants on all claims raised by all Plaintiffs.