**UNITED STATES of America,
Plaintiff-Appellant,**

v.

**Ignacio Antonio ZAYAS–MORALES, et al., Defendants-Appellees.**

**No. 81–5066.**

United States Court of Appeals,
Eleventh Circuit.

Sept. 13, 1982.

David J. Kline, Gen. Litigation & Advice, Crim. Div., Dept. of Justice, Washington, D. C., for plaintiff-appellant.

Theodore J. Sakorwitz, Robyn J. Herman, Miami, Fla., Jorge Sibila, Coral Gables, Fla., for Zayas-Morales.

Fabio A. Ruiz-Rojas, Coral Gables, Fla., for Luis Ramos-Bonet, et al.

Steven E. Chaykin, Miami, Fla., for Mariando-Pereira, Reyes-Pereira, Monzo & Monzo.

Melvyn Kessler, L. Mark Dachs, Brian R. McComb, Miami, Fla., for Henriquez-Godinez, Sanchez, Jiminez-Delgado, Alazamora-Ortega, Ramos De Falcon, Rivero-Alonzo.

Ivar M. Scholnicoff, Lopez & Harris, Miami, Fla., for Gustavo, Evelio Linares-Lunes, George Marrero.

Henri Gonzalez, Miami, Fla., for Yeyille-Defernandez & Gonzalez-Yeyille.

Stephen J. Kogan, Miami, Fla., for Fernandez-Pertierra.

Peter C. Clemente, Miami, Fla., for Fraga Lopez, Nunez De Pla, Iglesias Suarez.

Julian R. Murray, Jr., New Orleans, La., for Leopold Frade, Morris Doss, Hutchinson.

Blas E. Padrino, Coral Gables, Fla., for Perez-Hernandez, Rodriquez, Sainz, Basto Rodriquez, Cuello, Rodriquez, Alarez, Hurtado & Martinez-Valdes.

Steven E. Kreisburg, Miami, Fla., for Dorta, Bordas, Paz, Vera-Garcia.

Irma V. Hermandez, Hialeah, Fla., for Campas-Valdes & Diaz-Molina.

Fernando Eduardo Heria, Hialeah, Fla., for Anaya, Fonticiella, Farinas-Alvarez, Romeu, Gordillo.

Robin B. Gluck, Miami, Fla., for Cusidor.

David S. Kaufman, Lopez & Harris, Miami, Fla., for Estevez, Marrero-Ruiz, Linares-Luna.

Thomas J. McLaughlin, Miami, Fla., for Fernandez.

Edward McHale, Coral Gables, Fla., for Barberis.

Thomas G. Sherman, Terry DeMeo, Coral Gables, Fla., for Adolfo Padron & Harford Weld.

Before FAY and KRAVITCH, Circuit Judges, and YOUNG [*], District Judge.

FAY, Circuit Judge:

The Spring and Summer of 1980 witnessed a mass exodus of Cuban refugees from Mariel Harbor to Key West, Florida in what has been designated the "Freedom Flotilla." This appeal results from criminal charges brought against those responsible for transporting these aliens to the United States pursuant to 8 U.S.C. § 1324(a)(1). In a rare, but not unprecedented, procedure, the United States District Court for the Southern District of Florida sat *en banc* for argument on the defendants' motions to dismiss the indictments. The government and the defendants entered into a stipulation of the relevant facts, which permitted the court to rule on the motions based on its interpretation of the legal requirements for conviction under 8 U.S.C. § 1324(a)(1) (1976).

The majority of the court held that 8 U.S.C. § 1324(a)(1) requires proof of a "fraudulent, evasive, or surreptitious entry," which could not be proven under the stipulated facts. Three concurring judges found that conviction under § 1324(a)(1) did not require an "entry," but that "intent to smuggle" was an element of the statute. One judge dissented, failing to perceive the need for either additional requirement. These conclusions resulted in the dismissal of the indictments. From this dismissal the government now appeals. We are persuaded by the clear, simple logic which underlies the concurring opinion, but refrain from adding the requirement of specific intent. We therefore affirm the dismissal based on the government's inability to prove the defendants possessed a general criminal intent under the stipulated facts. *Affirmed.*

*The Freedom Flotilla*

For centuries the United States of America has served as a haven to refugees fleeing from their native lands in search of

[*] Honorable George C. Young, U. S. District Judge for the Middle District of Florida, sitting by designation.

freedom. The plight of over 125,000 undocumented Cuban nationals who were transported to the United States during the Freedom Flotilla resulted in the eighty-four indictments dismissed by the District Court in this case. The indictment charged 336 defendants with substantive violations of 8 U.S.C. § 1324(a)(1)[1] or with conspiracy to violate that statute. Notably, the defendants in this case are not the aliens, but rather those owners, captains, and crew members responsible for transporting the Cuban nationals to the United States.

The first group of aliens arrived in the United States on April 21, 1980. Two days later, the United States Coast Guard initiated warnings by means of radio broadcasts alerting all listeners to the possibility of arrests and seizure of vessels for transporting undocumented aliens to the United States. By that time many of the vessels had left the United States for Mariel Harbor. At approximately the same time, the United States Customs Service began issuing written notices requiring customs clearance prior to departure from United States ports and warning that transportation of undocumented aliens was illegal. Dissatisfied with the results of the initial efforts to halt the mass influx of aliens, on May 14, 1980, the President imposed an embargo on boats attempting to leave our territorial waters and ordered a return of United States vessels from Mariel Harbor. *Pollgreen v. Morris*, 496 F.Supp. 1042, 1047 (S.D.Fla.1980). So ended the Freedom Flotilla.

The government subsequently brought the charges now at issue in this appeal. The defendants moved to dismiss the indictments pursuant to Federal Rule of Criminal Procedure 12(b). In a cooperative effort, the defendants and the government stipulated to the following facts:

1. Defendants are owners, captains and/or crew members of vessels which departed from Mariel Harbor, Cuba, or were enroute to Mariel, Cuba.

2. The object of the trip to and/or from Mariel, Cuba, was to bring back Cuban nationals without visas.

3. Defendants presented these Cuban nationals to Immigration and Naturalization Service officials at Key West, Florida, so that these Cuban nationals could seek political asylum or some other status which would permit them to come into the United States and remain.

4. The Cuban nationals were issued I-94's pursuant to 8 U.S.C. 1182(d)(5), granting them parole status.

All parties agreed the District Court possessed the ability to rule on the motions "without invading the province of the ultimate finder of fact." Record, vol. V, at 289. In addition, all agreed that a single issue was presented: whether, as a matter of law, the defendants' acts were criminally proscribed by 8 U.S.C. § 1324(a)(1).

---

1. 8 U.S.C. § 1324(a) (1976) provides:

Any person, including the owner, operator, pilot, master, commanding officer, agent, or consignee of any means of transportation who—

(1) brings into or lands in the United States, by any means of transportation or otherwise, or attempts, by himself or through another, to bring into or land in the United States, by any means of transportation or otherwise;

(2) knowing that he is in the United States in violation of law, and knowing or having reasonable grounds to believe that his last entry into the United States occurred less than three years prior thereto, transports, or moves, or attempts to transport or move, within the United States by means of transportation or otherwise, in furtherance of such violation of law;

(3) willfully or knowingly conceals, harbors, or shields from detection, or attempts to conceal, harbor, or shield from detection, in any place, including any building or any means of transportation; or

(4) willfully or knowingly encourages or induces, or attempts to encourage or induce, either directly or indirectly, the entry into the United States of—

any alien, including an alien crewman, not duly admitted by an immigration officer or not lawfully entitled to enter or reside within the United States under the terms of this chapter or any other law relating to the immigration or expulsion of aliens, shall be guilty of a felony, and upon conviction thereof shall be punished by a fine not exceeding $2,000 or by imprisonment for a term not exceeding five years, or both, for each alien in respect to whom any violation of this subsection occurs: *Provided, however,* That for the purposes of this section, employment (including the usual and normal practices incident to employment) shall not be deemed to constitute harboring.

*The Majority's "Entry" Requirement*

At the hearing on the motions to dismiss the government argued that Section 1324(a)(1), by its plain language, required only that the aliens are "brought into" the country and that there was no requirement that a formal *entry* be proven.[2] The majority surveyed the case law on 8 U.S.C. § 1324 and its predecessors, and found that "every reported conviction under subsection (a)(1) [had] involved a surreptitious, fraudulent or evasive *entry* into this country by aliens." *Id.* at 293 (emphasis supplied). It also found support for the entry requirement in the legislative history of the statute.

The court then engaged in a great war of semantics with the government over the true interpretation of the statutory language of Section 1324(a)(1). The battle of words involved a fine distinction drawn by the majority between the phrases "bringing *to*" and "bringing *into*." The court armed itself with a comparative analysis of the three civil penalty sections preceding section 1324. All three sections (1321, 1322, and 1323) imposed civil penalties for bringing aliens *to* the United States. Section 1324, however, contained the phrases "bring *into*," "land in," and "entry." The court found this to clearly demonstrate Congress' intent to distinguish "to" from "into." "Common sense and the elementary principles of the English language dictate that "bringing in," "bringing into" or "inducing the entry into" are words that must necessarily be used to describe the aiding and abetting of "coming into," all of which deal with "entry." *Id.* at 298. Further, Congress had defined "entry" as "any coming of an alien *into* the United States. . . ." 8 U.S.C. § 1101(a)(13) (1976) (emphasis supplied). The majority thus concluded that § 1324 had been congressionally designed to prohibit the "illegal *entry* of aliens into the United States in a fraudulent, evasive, or surreptitious manner." *Id.*

Under the stipulated facts, the defendants presented the Cuban nationals to Im-migration and Naturalization Service officials thereby precluding any assertion by the government of a fraudulent or evasive entry. Furthermore, the court found that "[i]t would be anomalous . . . to construe § 1324 as imposing criminal penalties on one who merely transports an alien to the entry station so that he may make application to the proper authorities for admission into the United States" when "Congress did not make it illegal for an unauthorized alien to present himself to immigration officials for admission at a border checkpoint." *Id.* at 299.

Our examination of the statutory language, its legislative history, and relevant case law brings us to the same result as the majority—dismissal of the indictments—and although support can be found to substantiate the majority's creation of a "fraudulent, evasive, surreptitious entry" requirement for conviction under section 1324(a)(1), we find it unnecessary to read the statute so narrowly. As did the concurring judges, we focus on the state of mind of the defendants. "Clearly, guilty knowledge and criminal intent are essential elements of the crime proscribed by § 1324(a)(1)." *Id.* at 303. Criminal intent having been eliminated by the stipulation, these prosecutions must fail.

*En Banc Consideration—An Innovative Idea*

■ Before embarking on our analysis of section 1324, however, we divert our attention to the novel procedure employed by the Southern District of Florida in rendering a conclusive opinion on this "hot" issue. Faced with a multiplicity of motions to dismiss the indictments in these cases and the potential for independently rendering differing opinions, all the active judges of the Southern District of Florida authorized the transfer of the cases to the District Court *en banc.* The identity of facts and the common nuclear issue created the ideal atmosphere for implementation of this unique procedure.[3] By ruling on these

---

**2.** Case law has expanded the definition of a formal entry to include not only the "coming of an alien into the United States . . .," but additionally freedom from restraint. *United States v. Hanna*, 639 F.2d 194, 195 (5th Cir. 1981) (citing 8 U.S.C. § 1101(a)(13) (1970)).

**3.** The District Court relied on 28 U.S.C. §§ 132 and 137 for statutory authority to rule on the motions *en banc.* 28 U.S.C. § 132(c) (1976) provides:

Except as otherwise provided by law, or rule or order of court, the judicial power of a district court with respect to any action, suit or proceeding may be exercised by a single judge, who may preside alone and hold a regular or special session of court at the same time other sessions are held by other judges.

28 U.S.C. § 137 (1976) provides:

cases simultaneously, the District Court was able to insure uniformity and intracourt comity, and at the same time avoid any unnecessary duplication of judicial effort.

All parties agree the District Court possessed the authority to assign the cases to the court *en banc.* We add our approval and commend the judges of the Southern District for the innovative manner in which they handled this massive case. In addition, we commend all the lawyers whose cooperative efforts in agreeing on a stipulation of the facts permitted the efficient disposition of the motions.

*Cruising Through § 1324*

 The concurring judges declined to read an "entry" requirement in section 1324(a)(1) as the majority had done. But they did discern an "intent to smuggle" as an element of section 1324(a)(1)—an element incapable of existence under the stipulated facts. We agree that a conviction under this statute requires proof of the defendants' criminal intent, but we find it unnecessary to extend the requisite intent beyond that of general criminal intent.

Hornbook law defines a crime as *actus reus* plus *mens rea,* subject of course to a long list of exceptions. The United States Supreme Court has made it clear that guilty knowledge and criminal intent are fundamental elements of any serious crime unless Congress indicates otherwise. *Morissette v. United States,* 342 U.S. 246, 72 S.Ct. 240, 96 L.Ed. 288 (1952). *See also Lennon v. Immigration and Naturalization Service,* 527 F.2d 187 (2d Cir. 1975). *Cf. United States v. Ayo-Gonzalez,* 536 F.2d 652 (5th Cir. 1976), *cert. denied,* 429 U.S. 1072, 97 S.Ct. 808, 50 L.Ed.2d 789 (1977).

> The contention that an injury can amount to a crime only when inflicted by intention is no provincial or transient notion. It is as universal and persistent in mature systems of law as belief in freedom of the human will and a consequent ability and duty of the normal individual to choose between good and evil. A relation between some mental element and punishment for a harmful act is almost as instinctive as the child's familiar exculpatory "But I didn't mean to," and has afforded the rational basis for a tardy and unfinished substitution of deterrence and reformation in place of retaliation and vengeance as the motivation for public prosecution.

342 U.S. at 250–51, 72 S.Ct. at 243 (footnotes omitted). Even government counsel could not deny that general criminal intent must be proven for a conviction under this statute.

Judge Eaton, author of the concurring opinion, began his analysis of the intent requirement with the general underlying premise, which we find controlling. "Crime, as a compound concept, generally constituted only from concurrence of an evil-meaning mind with an evil-doing hand...." *Id.* at 251, 72 S.Ct. at 243. His analysis did not end there. In order to determine the requisite criminal intent, Judge Eaton returned to the legislative history of the statute.

A derivation of the Chinese Exclusion Act of 1882 enacted to prevent the illegal introduction of Chinese laborers into the United States, section 1324 was created to broaden the scope of existing immigration laws. *See, e.g., Taylor v. United States,* 207 U.S. 120, 28 S.Ct. 53, 52 L.Ed. 130 (1907); *Middleton v. United States,* 32 F.2d 239 (5th Cir. 1929). Congress clearly articulated its purpose—to make it an offense to harbor or conceal aliens who have entered this country illegally, and to strengthen the law generally in preventing aliens from entering or remaining in the United States illegally." S.Rep. No. 352, 64th Cong., 1st Sess. (1916);

---

The business of a court having more than one judge shall be divided among the judges as provided by the rules and orders of the court.

The chief judge of the district court shall be responsible for the observance of such rules and orders, and shall divide the business and assign the cases so far as such rules and orders do not otherwise prescribe.

If the district judges in any district are unable to agree upon the adoption of rules or orders for that purpose the judicial council of the circuit shall make the necessary orders.

H.R.Rep.No.1377, 82d Cong., 2d Sess., *reprinted in* [1952] U.S.Code Cong. & Ad. News 1358. This language indicates a Congressional desire to eliminate the *illegal* introduction of aliens into the United States; not the mere transportation of refugees seeking asylum. The anti-smuggling[4] nature of this legislation led Judge Eaton to perceive an implicit element of specific intent—the intent to smuggle. Indeed, the legislative history of a recent 1981 amendment to section 1324(b) speaks in terms of alleviating obstacles which previously "have hampered INS [Immigration and Naturalization Service] in its overall *antismuggling* efforts and hindered attempts to stop the illegal boatlift from Cuba." H.R.Rep.No. 264, 97th Cong., 1st Sess., *reprinted in* [1981] U.S.Code Cong. & Ad.News 2577, 2596 (emphasis supplied).

This analysis is also bolstered by case law involving convictions under section 1324(a)(1). These cases have consistently referred to section 1324 and its predecessors as a means of preventing the smuggling of aliens into the United States. *See United States v. Bunker*, 532 F.2d 1262, 1266 (9th Cir. 1976) ("prosecutions are commonly based on smuggling of the usual sort...."); *United States v. Evans*, 333 U.S. 483, 488, 68 S.Ct. 634, 637, 92 L.Ed. 823 (1948) ("the section as originally enacted was limited to acts of smuggling"); *United States v. Lopez*, 521 F.2d 437, 439 (2d Cir.), *cert. denied*, 423 U.S. 995, 96 S.Ct. 421, 46 L.Ed.2d 368 (1975) ("As originally enacted ... that statute prohibited simply the smuggling or unlawful bringing of aliens into the United States.").

Ours is not the first attempt to glean from this statute the elements essential to a conviction under section 1324(a)(1). Although subsection (a)(1) does not specify a requirement of knowledge, as do subsections 2, 3, and 4, that requirement has been judicially recognized. "[A] reasonable construction of section 1324(a)(1) requires guilty knowledge in order to sustain the constitutional validity of the statute." *United States v. Boerner*, 508 F.2d 1064, 1068 (5th Cir.), *cert. denied*, 421 U.S. 1013, 95 S.Ct. 2418, 44 L.Ed.2d 681 (1975). *See also Bland v. United States*, 299 F.2d 105 (5th Cir. 1962). In fact, the issue of criminal intent with respect to section 1324(a)(2) surfaced in *United States v. Herrera*, 600 F.2d 502 (5th Cir. 1979), where the court held the exclusion of a phone conversation improper because it was relevant to the defendant's state of mind. Guilty knowledge and criminal intent are oft times used interchangeably. *See generally* 21 A.L.R. Fed. 254, 262–63 (1974). Nevertheless, they are separate, distinct elements. By our decision in this case, we simply articulate that which is inherent in the prosecution of any serious crime—proof of a general intent to commit an illegal act.[5] Under the stipulation of facts presented, we find the government incapable of sustaining the burden of proof on this element. While the Coast Guard warnings might have been used to prove "knowledge," the defendants clearly "intended" to submit the aliens to proper officials in full compliance with the law.

■ Under the third prong of the stipulation, the parties agreed that not only had the defendants presented the aliens to the proper officials, but that their *intention* in doing so was to allow the aliens to seek *legal* status in this country. The stipulation identified both the action taken by the defendants and the state of mind they possessed in doing so. Such an intention neutralizes any government theory that the defendants possessed the criminal intent necessary for a conviction under 8 U.S.C. § 1324(a)(1). We emphasize, however, that our conclusion is made possible solely by virtue of the stipulated facts entered into in this case.

---

4. "Smuggling" is defined as "bring[ing] into or tak[ing] out of a country (merchandise, forbidden articles, or persons contrary to law and with a fraudulent intent...." Webster's Third New International Dictionary 2153 (1966).

5. Were we to hold that criminal intent is not required, anyone who might rescue an alien from the sea, bring them to our shores, and deliver them to immigration officials for proper processing would be subject to prosecution under this statute. We cannot conceive such an illogical application of this statute.

Our review of these dismissals has been analogous to that which we would undertake in reviewing a grant of a motion for summary judgment. The stipulation of facts resolved any questions of material fact, leaving us to determine only whether the defendants were entitled to the dismissals as a matter of law. We answer in the affirmative. We hold that a successful prosecution under 8 U.S.C. § 1324(a)(1) requires proof of general criminal intent. The stipulated facts presented here negate the existence of that element. Thus, the defendants are entitled to the dismissals as a matter of law.

As long as America stands free, we shall continue to confront aliens seeking freedom from the tyrannies of their native lands. Our very existence depends upon our ability to respond to their needs and at the same time cope with the realities of our own expanding population. These cases represent just one of the legal battles to be waged in an ongoing dilemma. However, "[i]f these defendants violated some provision of the United States immigration laws, it was *not* the criminal anti-smuggling statute under which they were charged." Record, vol. V, at 306. AFFIRMED.