**UNITED STATES of America, Plaintiff,**

v.

**Francisco ARMENDARIS, Defendant.**

No. 81–0046–Civ.

United States District Court,
S.D. Florida.

Dec. 27, 1984.

Robert A. Rosenberg, Asst. U.S. Atty., Miami, Fla., for plaintiff.

Frank H. Alvarez, Miami, Fla., for defendant.

## MEMORANDUM OPINION INCLUDING FINDINGS OF FACTS AND CONCLUSIONS OF LAW

ARONOVITZ, District Judge.

THIS CAUSE came on for trial before the Court without a jury on Plaintiff UNITED STATES OF AMERICA's Complaint (Docket No. 1) based on Defendant FRANCISCO ARMENDARIS' alleged non-payment of a fine imposed pursuant to 8 U.S.C. § 1323. The Court heard and received into evidence, live testimony and numerous exhibits, and has had the benefit of closing argument by counsel. The Court has carefully considered the foregoing as well as the pertinent portions of the record, including the prior rulings in the instant case, particularly the opinion of this Court denying the Government's Motion for Summary Judgment (entered August 26, 1981), 520 F.Supp. 1038, which denial was affirmed by the Eleventh Circuit, and being otherwise fully advised in the premises, the Court makes the following findings of fact and conclusions of law:

### FINDINGS OF FACT

1. The case *sub judice* arises out of the unique setting of the Mariel Boatlift wherein thousands of Cuban Nationals were carried by boat from Mariel Harbor, Cuba, to Southern Florida. For a proper presentation of the general conditions and circumstances that prevailed during the Mariel Boatlift, the Court adopts and incorporates as though fully set forth herein, those general findings of fact entered by this Court under date of January 24, 1984, in the decision of *Pollgreen v. Morris*, 579 F.Supp. 711, 714 (S.D.Fla.1984), from which an appeal is presently pending in the Eleventh Circuit. The Court adopts those findings of fact in *Pollgreen* insofar as they relate to the general historical context of the Mariel Boatlift during the spring of 1980. Some of the dates of the occurrences set forth in the testimony in the instant case are more accurately established in that earlier related opinion.

2. On or about April 19, 1980, small clusters of boats began to leave the docks

of Key West, Florida, on voyages to Mariel Harbor, Cuba, (hereinafter "Mariel") to pick up refugees.

3. On April 21, 1980, the first boatloads returned from Mariel foreshadowing the massive migration that was about to follow. Soon thereafter, nearly 1800 boats carrying approximately 114,000 refugees arrived on our shores in Key West and other parts of Southern Florida.

4. Within the context of that occurrence in April of 1980, in one of the first ventures to Mariel during the early phases of the boatlift, Defendant FRANCISCO ARMENDARIS, with his brother-in-law, Nelson Aguilar, purchased a vessel called "The Drumstick" to travel to Cuba. The mission of this voyage was to attempt to bring out Defendant's family members who were not otherwise allowed to leave Cuba through normal channels of international travel.

5. Defendant's first effort was essentially a failure. It succeeded only insofar as Defendant was able to give to the Cuban authorities a list of the relatives that he sought to bring back.

6. On that first trip, Defendant had occasion to view the oppressive military presence of Cuban authorities in Mariel Harbor. The harbor was teeming with patrol boats and its docks were filled with armed troops. Nevertheless, Defendant and his brother-in-law were permitted to depart freely. No effort was made to prevent either Cuban American from leaving Mariel Harbor. Accordingly, the two men left Mariel and returned to Key West sometime near the end of April.

7. Thereafter, on May 5, 1980, President Jimmy Carter made a public statement which was widely disseminated. The subject of the presidential statement was the massive influx of Cuban nationals into the United States from the Mariel boatlift. In that speech, the President stated, "We'll continue to provide an open heart and open arms to refugees seeking freedom from Communist domination and from the economic deprivation brought about primarily by Fidel Castro and his Government." (Government's Exhibit 2).

8. On May 14, 1980, after further reflection on the subject of the boatlift, the President overrode his "Open Heart and Open Arms" speech of May 5th and took affirmative steps to end the freedom flotilla by imposing a blockade on outgoing vessels and ordering the return of United States vessels already at Mariel Harbor. That action was taken pursuant to the overwhelming problems which became apparent as more and more refugees streamed into the United States and in particular into Southern Florida from Mariel.

9. Despite this apparent reversal of policy, the Court must examine the instant case in the context of the conditions which existed and prevailed on or about May 11, 1980, when Defendant FRANCISCO ARMENDARIS and his brother-in-law Nelson Aguilar departed Key West for a second voyage to Mariel. On the one hand, the President of the United States had publicly embraced the opportunity to receive the refugees from Cuba. The Court does not criticize the President's policy, but merely comments on the same and notes that at the same point in time, the evidence indicates that officials of the various agencies of the United States Government, while not necessarily directly implicating themselves in any effort or procedure to cause boats to leave Key West to travel to Cuba and bring refugees back, did nevertheless, adopt an attitude which could easily have been, and in fact was, construed by the public as one which was favorably receptive to the boatlift.

10. The mass migration of Cuban immigrants to our shores which has come to be known as "The Mariel Boatlift", was an event unique in modern history. The only incident which this Court can recall as being even remotely comparable was the evacuation of Dunkerque on the French Coast during World War II. Yet even that could not compare with what happened between Key West and Mariel during the months of April and May in 1980. Indeed, in order to fully understand the extreme excitement, the overwhelming emotion, and

the human elements that were brought into play, one had to witness the events firsthand in Key West, in those boats, and in Mariel. The frantic and emotional nature of these events emerges when eyewitnesses relive, through their courtroom testimony, the unfolding drama of Mariel.

11. This Court had heard and considered such testimony in the case of *Pollgreen v. Morris*, 579 F.Supp. 711 (S.D.Fla. 1984). Once again, in the instant case, this Court has heard and considered the testimony of those who experienced the boatlift firsthand.

12. Moreover, other Judges sitting in this District have heard and considered the eye-witness testimony attesting to the absolute panic and consternation that prevailed in Mariel Harbor when armed Cuban patrol boats policed the vast harbor and its entrance. Soldiers armed with rifles and machine guns randomly prevented entrance to and exit from the harbor, controlled the docks, boarded and searched vessels, and ordered that vessels take aboard certain individuals. No opportunity was provided for anyone on the vessels to reject these additional "passengers".

13. This is the testimony that was reiterated in the instant case. When "The Drumstick" arrived in Mariel for the second time, Defendant ARMENDARIS furnished to the Cuban authorities a letter, which purported to demonstrate that his four relatives had been authorized to leave Cuba in 1962. (Defendant's Exhibit 1). Additionally, Defendant ARMENDARIS gave the Cuban authorities the names of six other relatives who had no papers of any kind which would authorize them to leave Cuba.

14. The testimony indicates quite clearly that Defendant ARMENDARIS went to Mariel a second time with the sole intent to bring his ten relatives, and no others, out of that country and into the United States. It is equally clear that Defendant ARMENDARIS was not permitted to bring out any of his relatives unless he brought out other Cuban nationals foisted upon him forcibly by the Castro regime. The authorities threatened that if Defendant ARMENDARIS did not take these other Cuban nationals on board his boat, then no one would be allowed out of the harbor.

15. The Court is convinced and satisfied that this was the prevailing attitude of the Cuban authorities as it was evidenced toward hundreds upon hundreds of boats that were, in effect, prisoners in Mariel Harbor. The sum and substance of these circumstances resulted in, and indeed constituted, force, duress and coercion exerted upon those individuals who sought to return refugees from Cuba. The force, duress and coercion was asserted directly by the Castro regime upon hundreds of persons like and including Defendant ARMENDARIS.

16. On May 14, 1980, the date that President Carter took the first affirmative steps to halt the Freedom Flotilla by imposing a blockade on outgoing vessels and ordering the return of U.S. vessels at Mariel Harbor, "The Drumstick" was already at Mariel. Therefore, Defendant ARMENDARIS could not at that point avoid travelling to Cuba and thereby comply with the President's May 14th orders. Rather, at that time, "The Drumstick" was already at the mercy of the Castro regime and could not leave the harbor without those other refugees whom the authorities packed into the vessel.

17. Finally, the evidence demonstrates that on May 11, 1980, when Defendant FRANCISCO ARMENDARIS and his brother-in-law Nelson Aguilar departed from Key West in "The Drumstick", they believed with good reason that they could lawfully travel to Cuba and bring their relatives back to Florida. Indeed, they had every reason to believe that they could make this second voyage to Cuba based on the public representations of the President of the United States and the Government of this country.

## CONCLUSIONS OF LAW

1. This is a civil action brought by the United States of America pursuant to 8

U.S.C. §§ 1329 and 1330, and 28 U.S.C. § 1345 for non-payment of a fine assessed because Defendant transported into the United States fourteen (14) Cuban Nationals who did not have valid unexpired visas as required by law. (Docket No. 1).

2. Defendant filed a Counterclaim to the Government's case in chief for the damages he allegedly suffered as a result of the Government's seizure of his vessel. (Docket No. 4).

3. The Court hereby adopts and incorporates as though fully set forth herein, those conclusions of law entered by this Court in *Pollgreen v. Morris,* 496 F.Supp. 1042 (S.D.Fla.1980), wherein a preliminary injunction issued against the Government which had seized vessels used to bring Cuban refugees to the United States. In that opinion, this Court held that due process required the owners and operators of the seized vessels be accorded postseizure hearings wherein such seizures, as well as the imposition of fines, could be contested. The decision also highlighted the significance of the defense of duress which is crucial to the instant cause.

4. The Court further adopts and incorporates as though fully set forth herein, those conclusions of law entered by this Court in the second published opinion of *Pollgreen v. Morris,* 579 F.Supp. 711 (S.D. Fla.1984). That recent decision considered the boatowners claims of due process deprivations due to the seizures and related fines. Moreover, in that opinion, this Court noted:

> There seems little doubt but that parties who participated in the Mariel boatlift had every reason to believe that at least until May 14, 1980, that no violation of United States policy or law was occurring by bringing the Cuban nationals into the United States. *See, United States v. Frade,* 709 F.2d 1387 (11th Cir.1983), at P. 1394–95:
>
> > "... Congressman Long testified that the priests 'wanted general information about making sure what the United States policy was, to do it in accordance with the policy of the United

States.' He stated that, at that time he 'was of the impression from the President's [May 5] statement ... that the United States was encouraging and welcoming' the boatlift."

579 F.Supp. at 717. Regarding the President's statement of May 5th, this Court further observed:

> As can be observed from the foregoing, the President's "open heart and open arms" statement was widely publicized and broadly interpreted as Government approval of the boatlift. The Eleventh Circuit further observed:
>
> > "... But the import of the specific provision in subparagraphs (a) through (f) [of the President's Statement on the Administration Policy Toward the Refugees of May 14, 1980], seen against the background of Mariel, as we understand it, is that the Administration would continue to welcome legitimate Cuban refugees, but would take firm coordinated action to prevent the two dangers which had emerged from the boatlift: death and injury at sea resulting from passage in unsafe vessels, and entry into the United States of Cuban undesirables forced onto the boats by the Castro regime."
>
> *Frade, supra,* at page 1396.

579 F.Supp. at 717.

5. As these conclusions of law already reflect, the Court would be remiss to omit specific reference to the seminal Eleventh Circuit opinion on the subject presently pending, namely, *United States v. Frade,* 709 F.2d 1387 (11th Cir.1983). That case involved an appeal from a conviction rendered in this District arising out of the transport of Cuban refugees in the Mariel boatlift. The Eleventh Circuit Court of Appeals reversed the conviction finding that there was insufficient notice to the defendant/appellants that their conduct in transporting refugees was violative of the law. *See, United States v. Fernandez-Pertierra,* 523 F.Supp. 1135 (S.D.Fla.1981); *United States v. Anaya,* 509 F.Supp. 289 (S.D.Fla.1980).

6. The Court also refers to the criminal case of *United States v. Zayas-Morales*, 685 F.2d 1272 (11th Cir.1982), wherein the Eleventh Circuit affirmed the dismissal of eighty-four (84) indictments, charging three hundred and thirty-six (336) defendants with substantive violations of 8 U.S.C. 1324(a)(1) and with conspiracy to violate that statute. The Court stated in that opinion:

We therefore affirm the dismissal based on the Government's inability to prove the defendants possessed a general criminal intent under the stipulated facts.

685 F.2d at 1273. The Court is mindful that the *Zayas-Morales* decision is a true criminal case and that the instant case is a civil action brought by the Government for non-payment of a fine. Still, the statute under which the fine was imposed is quasi-criminal in nature given the type and amount of the penalties assessed and the severity of the penalties imposed. It is therefore, not entirely illogical to argue or claim that to some extent the intent of the parties should be considered in the instant matter. To this end, the Court finds the analysis and holding in *Zayas-Morales* extremely persuasive.

■ 7. On the primary claim asserted by the Government against Defendant for the non-payment of the fine, the Court finds that the Government cannot prevail and that Defendant does prevail by reason of the extreme duress and coercion that have been found to have existed at Mariel during the time that Defendant travelled to Cuba in April and May of 1980.

8. Alternatively and separately, the Court finds that Defendant did bring fourteen (14) undocumented aliens into the United States. As to two of those fourteen aliens, there is colorable documentation, (Defendant's Exhibit 1). However, in a technical sense, there was a violation of 8 U.S.C. § 1323. Assuming this to be the case and assuming that the statute is applicable, the penalty of $1,000 per undocumented alien should nevertheless be mitigated and/or remitted in full by reason of the duress and coercion exerted upon Defendant at Mariel. Any act or conduct complained of by the Government was a direct result of the exertion of duress upon Defendant FRANCISCO ARMENDARIS and his brother-in-law Nelson Aguilar.

9. Additionally, it would be unconscionable for this Court to be called upon to uphold and impose the fines involved in this action in view of the occurrences which took place at Mariel as established by the unrebutted testimony. No Court, sitting as a Court of Equity, or even clothed with the powers of equity, would refuse to mitigate or remit the fines imposed in the instant case.

10. It would also be unconscionable for this Court to allow the imposition of fines when many of the refugees who were the basis of the fines are now, according to published statements, about to be granted status as resident aliens. Some 116,000 to 125,000 refugees from the Mariel boatlift are on the verge of being deemed resident aliens, yet the persons responsible for bringing them to this country are being penalized and subjected to stiff fines as well as forfeitures of their vessels. The Court does not fault the Government for granting the Mariel immigrants refugee status. Rather, the Court notes that it would be unconscionable, on the one hand, to permit that group of persons to receive the benefits of living in the United States, while, on the other hand, to simultaneously penalize those who transported the refugees here. Justice requires that the Court consider this apparent paradox when rendering its decision of the instant cause.

■ 11. With regard to Defendant's Counterclaim in the instant suit, the evidence does not establish a basis for relief. The defendant-counterclaimant has not carried his burden of proof and has not established any factual basis that would entitle him to receive the benefits of recompense from the United States. Therefore, the Court concludes as a matter of law, that the counterclaim has not been proven and that due to the lack of foundation in law and fact, all requests for relief therefrom are denied.

12. A Final Judgment denying the Government's claim for relief and further, denying the Defendant's counterclaim will be entered in accordance herewith.

13. The costs of the action are to be borne by the respective parties.