[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 17-11507

_____

D.C. Docket No. 1:16-cr-20662-KMW-2

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

versus

DAVIT CHKUASELI,
NILOLOZ TSKITISHVILI,

Defendants - Appellants.

_____

Appeals from the United States District Court
for the Southern District of Florida

_____

(April 24, 2018)

Before JORDAN and JILL PRYOR, Circuit Judges, and DUFFEY,[*] District
Judge.

PER CURIAM:

_____

[*] Honorable William S. Duffey, Jr., United States District Judge for the Northern District
of Georgia, sitting by designation.

In this appeal, Niloloz Tskitishvili and Davit Chkuaseli challenge their convictions for alien smuggling charges on the ground that there was insufficient evidence to support their convictions. They also contend they are entitled to a new trial based on the cumulative effect of errors that occurred during the trial. After careful consideration and with the benefit of oral argument, we conclude that there was no reversible error and therefore affirm.

## I.    BACKGROUND

Tskitishvili and Chkuaseli were indicted for conspiring to encourage and induce an alien to come to the United States, in violation of 8 U.S.C. § 1324(a)(1)(A)(v)(1), and on seven counts of encouraging and inducing an alien to come to the United States, in violation of 8 U.S.C. § 1324(a)(1)(A)(iv). They pled not guilty.

The evidence presented at trial showed that one summer day Tskitishvili and Chkuaseli, citizens of the country of Georgia residing in the United States, rented two 24-foot lake deck boats in Fort Lauderdale, Florida. Tskitishvili and Chkuaseli claim they rented the boats for recreation. The government's evidence showed that they rented the boats for a different purpose—as part of a scheme to smuggle a group of Georgian citizens into the United States.[1]

---

[1] We set forth the facts viewing the evidence in the light most favorable to the government and drawing all reasonable inferences and credibility choices in favor of the jury's

2

Tskitishvili and Chkuaseli rented the boats from Lady Pamela Boat Rentals in Fort Lauderdale.  They paid $350 for each boat for three hours, paying for both rentals with one credit card.  The boats were designed to be used in lakes and rivers, not the ocean, and were not equipped with navigational equipment or lights.  The rental agreement prohibited taking the boats into the ocean or traveling more than 15 miles from Fort Lauderdale.

Contrary to the rental terms, Tskitishvili and Chkuaseli drove the boats to Bimini, Bahamas, and failed to return them at the end of the rental period.  When the boats were not returned, Lady Pamela's owner reported to Customs and Border Patrol that the boats were missing.

In Bimini, Tskitishvili and Chkuaseli met a group of Georgian citizens who wanted transportation to the United States (the "passengers"), and agreed to take them to the United States in their boats.  The passengers paid to refuel the boats and also paid for a hotel room for Tskitishvili and Chkuaseli to stay overnight in Bimini.  The next morning, Tskitishvili and Chkuaseli departed from Bimini with the passengers, and headed to the United States.

Shortly after leaving Bimini, the boats were spotted by a Customs and Border Patrol agent who was conducting surveillance from an aircraft.  The agent

---

guilty verdict, as we are required to do.  *See United States v. Boffil-Rivera*, 607 F.3d 736, 740 (11th Cir. 2010).

noticed that the boats matched the description of the ones reported missing from Lady Pamela's. The agent followed the boats for nearly two hours, as they traveled toward the United States. The boats did not stop or engage in any recreational activity.

When the boats entered United States waters, they were stopped by two Customs and Border Patrol vessels and two Coast Guard vessels. Just before the stop, an agent saw Tskitishvili throw something into the water.

Customs and Border Patrol Agent Ryan Haines boarded the first boat, where he encountered Chkuaseli and three passengers. Haines observed that the boat had no recreational or navigational equipment on board. Because Chkuaseli was driving the boat, Haines asked him for the boat's point of departure and destination. Chkuaseli answered that he had come from, and was returning to, Miami. Chkuaseli did not, however, mention that he had been to Bimini. From their conversation, Haines determined that Chkuaseli was able to communicate in English.

From the identification information Haines collected from the passengers, he concluded they were Georgian citizens who did not possess visas to enter the United States. Haines tried to question the passengers but found that most of them did not speak English. The passengers did not have luggage, and they were wearing t-shirts and hats. During the stop, Haines searched Chkuaseli. He found

4

$3,500 and identification inside Chkuaseli's wallet. Haines was unequivocal that he found a wallet containing cash on Chkuaseli.[2]

Customs and Border Patrol Agent Alex Mendez boarded the second boat and encountered Tskitishvili and four passengers. There also was no recreational or navigational equipment on the second boat. Mendez approached Tskitishvili because he was driving the boat and asked him for the boat's point of departure and destination. Like Chkuaseli, Tskitishvili responded that he had departed from, and was returning to, Miami. Tskitishvili also failed to mention that he had been to, and stayed overnight in, Bimini. When Mendez asked who owned the boat, Tskitishvili responded that a friend in Miami had rented the boat and given him permission to use it. From this conversation, Mendez determined that Tskitishvili also was able to communicate in English. The passengers on Tskitishvili's boat had no luggage, and possessed only two beach bags.

Believing that Chkuaseli and Tskitishvili were trying to smuggle the passengers into the United States, Haines and Mendez placed them and the passengers on a Coast Guard vessel. The Coast Guard delivered the passengers, along with Chkuaseli, to the Dania Beach Border Patrol Station.[3] Department of

---

[2] At trial, Haines was shown two photographs of wallets but was unable to identify which wallet belonged to Chkuaseli.

[3] Tskitishvili was taken to the hospital to receive medical treatment for an unrelated condition.

5

Homeland Security Special Agent Josh Miller, who was at the station when the passengers arrived, oversaw their interviews with Homeland Security. During these interviews, agents collected biographical information from the passengers, took their fingerprints, and examined identifying documents to determine their alienage. An agent completed an I-213 form for each passenger. The form is a record of a deportable or inadmissible alien, and contains biographical information such as the alien's name and date of birth.

Customs and Border Patrol Agent Jeff Marlett used the I-213 form information to search State Department databases to determine whether each passenger could lawfully enter the United States. The search was necessary because Georgian citizens were required to have visas to enter the United States. His searches disclosed that none of the passengers had a visa or permanent resident status, and thus they could not lawfully enter the United States.

While the passengers were at the station, Miller was responsible for handling the property the Coast Guard had collected on the boats. This property included $17,320 in United States currency and 50 Georgian lari. The passengers claimed that all the money belonged to them. Neither Tskitishvili nor Chkuaseli claimed any of it.

After the government presented its evidence, Tskitishvili and Chkuaseli moved for judgment of acquittal, arguing that the government failed to come

6

forward with sufficient evidence to prove they had committed the offenses.  The motion was denied.

Tskitishvili and Chkuaseli called Giorgi Sakhiashvili, one of the passengers, as a witness to show that they had not induced the passengers to come to the United States and that they believed the passengers could enter the country legally. Sakhiashvili explained how he met Tskitishvili and Chkuaseli in Bimini. According to Sakhiashvili, he booked a trip from Georgia to Havana, Cuba, and then to Nassau, Bahamas.  His plan was to try to get to the United States and seek asylum.  Sakhiashvili first met the other passengers at the airport in Georgia, where he discovered they also were trying to come to the United States.

Sakhiashvili testified that when they arrived in the Bahamas, Sakhiashvili and the other passengers did not have arrangements to get to the United States.  In Nassau, they unsuccessfully tried to find someone to take them by boat.   They were advised to go to Bimini to find a ride to the United States.  On their second day in Bimini the passengers went to the docks to try to find someone to take them to the United States.  They met Tskitishvili and Chkuaseli when they overheard them speaking Georgian.  Tskitishvili and Chkuaseli agreed to give them a ride to the United States.  The group departed the next morning.  Sakhiashvili denied that his meeting with Tskitishvili and Chkuaseli in Bimini had been prearranged.

7

Sakhiashvili testified that he told Tskitishvili and Chkuaseli he was from Miami, his family lived in New York, and he needed to get to the United States. Sakhiashvili was asked if, before departing Bimini, Tskitishvili had asked him if he had papers to get into the United States. The government objected to the question as hearsay, and the objection was sustained. Sakhiashvili later testified on redirect examination—without objection—that he told Tskitishvili and Chkuaseli that he had papers to enter the United States. Sakhiashvili acknowledged that Tskitishvili and Chkuaseli did not ask to see his passport or other documents.

The jury found Tskitishvili and Chkuaseli guilty on all counts. After trial, Tskitishvili and Chkuaseli filed motions for new trial and judgment of acquittal. The motions were denied. This is their appeal.

## II.    STANDARDS OF REVIEW

Several standards of review apply here. First, we review *de novo* the sufficiency of the evidence, "viewing all the evidence in the light most favorable to the government and drawing all reasonable inferences and credibility choices in favor of the jury's verdict." *United States v. Boffil-Rivera*, 607 F.3d 736, 740 (11th Cir. 2010).

Second, we review for abuse of discretion the district court's evidentiary rulings. *United States v. Augustin*, 661 F.3d 1105, 1123 (11th Cir. 2011). But we review *de novo* whether hearsay statements are testimonial for purposes of the

8

Confrontation Clause of the Sixth Amendment to the United States Constitution.

*United States v. Caraballo*, 595 F.3d 1214, 1226 (11th Cir. 2010).   Even if a

district court's evidentiary ruling constitutes an abuse of discretion, a defendant is

entitled to reversal only if the error was not harmless.  *Augustin*, 661 F.3d at 1123.

In addressing a claim of cumulative error, we examine the trial as a whole to

consider the cumulative effect of any errors and determine whether the defendant

was denied a fundamentally fair trial.  *See United States v. Calderon*, 127 F.3d

1314, 1333 (11th Cir. 1997).

Third, we review Tskitishvili and Chkuaseli's claim of prosecutorial

misconduct for plain error because they failed to object to the prosecutor's

argument at trial.  *United States v. Azmat*, 805 F.3d 1018, 1045 (11th Cir. 2015).

Under the plain error standard, there must be (1) error, (2) that was plain, (3) that

affected the defendant's substantial rights, and (4) that seriously affected the

fairness, integrity or public reputation of judicial proceedings.  *United States v.

Richardson*, 304 F.3d 1061, 1064 (11th Cir. 2002).

### III.   LEGAL ANALYSIS

### A.   Sufficiency of the Evidence

Tskitishvili and Chkuaseli contend that there was insufficient evidence to

support their convictions for conspiracy to encourage and induce aliens to enter the

United States, in violation of 8 U.S.C. § 1324(a)(1)(A)(v)(I) and for encouraging

and inducing aliens to enter the United States, in violation of 8 U.S.C.

§ 1324(a)(1)(A)(iv).  To establish a violation of § 1324(a)(1)(A)(iv), the

government must prove beyond a reasonable doubt that the defendant

"encourage[d] or induce[d] an alien to come to, enter, or reside in the United

States, knowing or in reckless disregard of the fact that such coming to, entry, or

residence is or will be in violation of law."  It is also a crime to conspire to commit

this substantive offense.  *Id.* § 1324(a)(1)(A)(v)(I).  Tskitishvili and Chkuaseli

claim that the government failed to prove that:  (1) they encouraged or induced the

passengers to come to the United States; (2) they knew or recklessly disregarded

that the passengers were aliens who were not permitted to enter the United States;

(3) the passengers were not legally permitted to enter the United States; and (4) for

the conspiracy count, that they agreed to bring the passengers into the United

States illegally.  We disagree.

### 1.    Sufficient Evidence Proved that Tskitishvili and Chkuaseli Encouraged or Induced the Passengers to Come to the United States.

Tskitishvili and Chkuaseli argue there was insufficient evidence to establish

that they encouraged or induced the passengers to come to the United States

because the passengers had decided to come to the United States to seek asylum

before meeting Tskitishvili and Chkuaseli.  Their argument erroneously relies on

the premise that the government had to prove that the defendants spurred the aliens

10

to come to the United States.  This argument, however, ignores that we have previously held that the phrase "encourages or induces" in § 1324(a)(1)(A)(iv) includes the act of "helping" an alien come to the United States.  *United States v. Lopez*, 590 F.3d 1238, 1248 (11th Cir. 2009).

In *Lopez*, we held that a district court properly instructed a jury that the term "encourage" in the statute included "to help."  *Id.* at 1249.  The defendant in that case had captained a boat to the Bahamas, refueled it, spent the night, picked up aliens from an abandoned hotel, drove them on his boat to the United States, and lied to Coast Guard officials when his boat was stopped.  *Id.* at 1252.  We explained that this evidence supported a finding that the defendant encouraged or induced the aliens to come to the United States because it showed he "was more than a mere passive boat driver in th[e] endeavor."  *Id.*

Applying, as we must, this broad definition of "encourages or induces," we conclude that a reasonable jury could have found that Tskitishvili and Chkuaseli helped the aliens come to the United States in violation of the statute.  Evidence showing that Tskitishvili and Chkuaseli rented boats that were intended and designed to be used for shorter trips, not in the ocean; that the rental period was consistent with local use; and that the passengers were dressed in tourist attire and had no luggage supports an inference that Tskitishvili and Chkuaseli tried to disguise themselves and the passengers as recreational boaters to evade detection

11

by United States border authorities.  We also find it significant that a jury could find that the matching stories told by Tskitishvili and Chkuaseli to the Customs and Border Patrol agents were not truthful and were an attempt to cover up that the passengers were arriving in the United States for the first time.  That is, they both told Customs and Border Patrol they were on a local trip for recreational purposes.[4]  A reasonable jury could find that by taking these steps to assist the passengers in avoiding detection, Tskitishvili and Chkuaseli encouraged or induced the aliens and were far more than "mere passive boat driver[s]."

### 2.    Sufficient Evidence Proved that Tskitishvili and Chkuaseli Knew the Passengers Were Entering the United States Illegally.

Tskitishvili and Chkuaseli next argue there was insufficient evidence to support their convictions because the government failed to prove that they knew or recklessly disregarded the fact that the passengers were aliens who were entering the United States illegally.  They claim they believed the passengers could legally enter the United States.  Viewing the evidence in the light most favorable to the government, however, a reasonable jury could have found that Tskitishvili and Chkuaseli acted with the requisite intent because they knew or were "aware of, but consciously and carelessly ignore[d], facts and circumstances clearly indicating"

---

[4] Tskitishvili and Chkuaseli assert that they did not lie to the agents but rather that their answers were unclear due to their limited English proficiency.  The jury, however, heard testimony from Haines and Mendez that Tskitishvili and Chkuaseli both were competent to communicate in English.  A reasonable jury, crediting the agents' testimony, could have rejected Tskitishvili and Chkuaseli's explanation that they lacked proficiency in English.

12

that the passengers could not lawfully enter the United States. *United States v. Kendrick*, 682 F.3d 974, 984 (11th Cir. 2012) (internal quotation marks omitted).

Sufficient evidence established that Tskitishvili and Chkuaseli either knew or recklessly disregarded that the passengers could not legally enter the United States. The defendants contend that meeting seven Georgian citizens in Bimini who were looking for a ride to the United States was a chance encounter. There was, as we described above, ample evidence to support the conclusion that Tskitishvili and Chkuaseli tried to hide the fact that the passengers were entering the United States for the first time and sought to avoid detection by United States authorities. Tskitishvili and Chkuaseli assert that they believed the passengers could legally enter the United States because the passengers told them that they possessed papers to do so. Tskitishvili and Chkuaseli, however, never asked to see any documents to verify that the passengers were legally permitted to enter the United States. Taken together, the circumstances of the meeting between Tskitishvili and Chkuaseli and the passengers, the passengers' willingness to travel on boats that were not equipped for ocean travel and lacked navigational equipment, and that Tskitishvili and Chkuaseli never verified that the passengers had the proper documentation to enter the United States support a finding that Tskitishvili and Chkuaseli ignored or recklessly disregarded facts and

13

circumstances showing that the passengers could not legally enter the United States.

Tskitishvili and Chkuaseli alternatively contend they lacked the requisite intent because it was legal to bring the passengers into the United States to seek asylum from the appropriate government officials. This argument is inconsistent with the language of § 1324. Section 1324 makes it a crime to encourage or induce a person to come to, enter, or reside in the United States knowing or in reckless disregard of the fact that such entry is in violation of the law. 8 U.S.C. § 1324(a)(1)(A)(iv). Nothing in this text permits a person to bring an unauthorized alien into the United States to seek asylum. Tskitishvili and Chkuaseli nevertheless argue that we recognized an "asylum" exception in *United States v. Zayas-Morales*, 685 F.2d 1272 (11th Cir. 1982), which they claim applies here. We disagree.

In *Zayas-Morales*, we considered the scope of a *different* federal anti-smuggling statute. *Zayas-Morales* involved the criminal prosecution of over 300 defendants who transported more than 125,000 Cuban nationals from Mariel Harbor, Cuba to Key West, Florida. *Id.* at 1274. The defendants were charged with violating a federal statute that barred "bring[ing] into" the United States aliens "not duly admitted by an immigration officer." *Id.* at 1274 n.1. The defendants moved to dismiss the indictment, claiming their actions were not illegal. *Id.* at

14

1273. For purposes of the motion to dismiss, the parties stipulated that the defendants transported Cuban nationals to immigration officials in Key West so that the Cuban nationals could seek asylum. *Id.* at 1277. We addressed on appeal the *mens rea* that the government was required to prove, holding the government had to establish "intent to commit an illegal act." *Id.* Because the parties stipulated that the defendants intended to submit the Cuban nationals to immigration officials in full compliance with the law, we concluded that the defendants did not violate the law. *Id.* at 1277-78.

Zayas-Morales does not control here. In *Zayas-Morales* we held that an earlier version of § 1324(a)(1) did not criminalize the act of bringing an undocumented alien directly to government officials so that he could apply for asylum. *Zayas-Morales* did not address the current version of § 1324(a)(1)(A)(iv). Perhaps more importantly, after we decided *Zayas-Morales*, Congress enacted § 1342(a)(2), which does not require a general criminal intent and makes it a misdemeanor to engage in the conduct at issue in *Zayas-Morales*—that is, bringing unauthorized aliens into the country to a designated port for processing. *See United States v. Garcia-Cordero*, 610 F.3d 613, 619 (11th Cir. 2010) (Korman, J., concurring) (explaining that § 1324(a)(2) subsequently was enacted to reach defendants, like those involved with the Mariel flotilla, who "had no intention of smuggling aliens into the United States" but brought "unauthorized aliens into the

15

country and to a designated port of entry for processing"). We thus reject the argument that Tskitishvili and Chkuaseli did not violate the law if they transported the unauthorized passengers to the United States for the purpose of gaining asylum.[5]

### 3.    Sufficient Evidence Proved that the Passengers Could Not Legally Enter the United States.

Tskitishvili and Chkuaseli next assert that there was insufficient evidence to support their convictions because the government failed to prove that the passengers on the boat were not legally permitted to enter the United States. They contend that there was no evidence establishing that the passengers on the boats were, in fact, the same individuals who were brought to the Dania Point Border Patrol Station and whose biographical information was reviewed. They specifically point to the government's failure to introduce testimony from the Coast Guard official, who supposedly transported the passengers from the boats to the station. Although it would have been helpful for the government to introduce such testimony, we nevertheless conclude that the government presented sufficient circumstantial evidence to support an inference that the passengers on the boats

---

[5] 8 U.S.C. § 1225(b)(1) authorizes the detention of aliens seeking asylum. If an alien, upon entering the United States, indicates he will seek asylum, the alien is referred for an asylum interview. If the alien presents a credible fear of persecution, the alien is detained for further consideration of the asylum application. 8 U.S.C. § 1225(b)(1)(B)(ii); *see also Jennings v. Rodriguez*, 138 S. Ct. 830, 837 (2018) (explaining that an alien, in certain circumstances, may be released from detention while his asylum application is pending).

16

were the individuals processed at the Dania Point Border Patrol station.  *See*

*United States v. Utter*, 97 F.3d 509, 512 (11th Cir. 1996) (recognizing that the

government may rely on circumstantial evidence).  Customs and Border Patrol

agents testified that the seven passengers on the boats were put on a Coast Guard

vessel.  Miller testified that the Coast Guard delivered the passengers to the station.

Any doubt that the individuals brought to the Dania Point Beach Station were the

passengers on the boat was resolved by Sakhiashvili's admission that he was one

of the passengers brought to the United States by Tskitishvili and Chkuaseli.

Sakhiashvili's I-213 form shows he was in the group of individuals who were

processed at the station.  This is enough to support that the government proved the

passengers were not authorized to enter the United States.

### 4.    Sufficient Evidence Proved that Tskitishvili and Chkuaseli Were Engaged in a Conspiracy.

Finally, Tskitishvili and Chkuaseli argue the evidence was insufficient to

convict them on the conspiracy count because the government failed to establish

that they entered into an agreement to bring the passengers to the United States

illegally.  We agree that a conspiracy charge requires the government to prove,

among other things, that co-conspirators entered into an agreement to commit an

unlawful act.  *United States v. Parker*, 839 F.2d 1473, 1477 (11th Cir. 1988).

Viewing the evidence in the light most favorable to the government, the

government here proved, through circumstantial evidence, that such an agreement

existed.  As we described above, there is evidence that Tskitishvili and Chkuaseli had a scheme to smuggle the passengers into the United States, which supports the conclusion that they agreed to commit an unlawful act.

We have considered carefully Tskitishvili and Chkuaseli's challenges to the sufficiency of the evidence.  We conclude that the government presented at trial sufficient evidence for a jury to find that Tskitishvili and Chkuaseli encouraged aliens to enter the United States, and conspired to commit this offense.

**B.    There Is No Cumulative Error Warranting a New Trial.**

Tskitishvili and Chkuaseli next argue they are entitled to a new trial because of cumulative errors that occurred during trial.  They claim these errors include the prosecutor's improper statement during closing argument, the district court's erroneous admission of the passengers' I-213 forms, and the district court's other erroneous evidentiary rulings.  To the extent that defendants have identified any errors, they do not warrant a new trial.

**1.    The Prosecutor Engaged in No Misconduct During Closing Argument.**

Tskitishvili and Chkuaseli contend that the prosecutor engaged in misconduct warranting a new trial when he stated in his closing argument that Chkuaseli was found with $3,500 in cash and suggested that it was payment for smuggling the passengers.  They argue that it was improper for the prosecutor to reference Haines's testimony about finding money while searching Chkuaseli

because it came out on cross examination that this testimony was false.  Because

Tskitishvili and Chkuaseli lodged no contemporaneous objection at trial, they must

show that the district court plainly erred in failing to declare a mistrial based on the

closing argument.

To establish prosecutorial misconduct, Tskitishvili and Chkuaseli must show

that (1) the prosecutor made an improper remark and (2) the remark prejudicially

affected their substantial rights.  *United States v. Gonzalez*, 834 F.3d 1206, 1226

(11th Cir. 2016).  In assessing prosecutorial misconduct alleged to have occurred

during a closing argument, we must keep in mind that the purpose of a closing

argument "is to assist the jury in analyzing the evidence."  *United States v. Bailey*,

123 F.3d 1381, 1400 (11th Cir. 1997) (internal quotation marks omitted).  During a

closing argument, "a prosecutor may not exceed the evidence" presented at trial,

but "he may state conclusions drawn from the evidence."  *Id.*

Here, we cannot say that the prosecutor's statement that Chkuaseli was

found with $3,500 was improper.  Chkuaseli points out that a passenger, not

Chkuaseli, claimed the money and that Haines could not identify Chkuaseli's

wallet.  Even though Haines could not remember what Chkuaseli's wallet looked

like, he remained firm in his testimony that he recovered a wallet from Chkuaseli.

Given Haines's testimony that he recovered the money from Chkuaseli, the

prosecutor did not exceed the evidence when he discussed in his closing argument

19

the cash found on Chkuaseli.  We conclude, therefore, that the prosecutor did not engage in misconduct during his closing argument.[6]

### 2.  The District Court Did Not Err in Admitting the Passengers' I-213 Forms.

Tskitishvili and Chkuaseli argue that the district court abused its discretion when it allowed the government to admit the passengers' I-213 forms because the forms contained testimonial hearsay inadmissible under the Constitution's Confrontation Clause.  We conclude there was no abuse of discretion.

The Sixth Amendment's Confrontation Clause guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him."  U.S. Const. amend. VI.  The Confrontation Clause bars the admission of testimonial statements from a witness who does not appear at trial unless the witness is unavailable and the defendant had a prior opportunity to cross examine the witness.  *Crawford v. Washington*, 541 U.S. 36, 53-54 (2004).  Statements are testimonial in nature "when the circumstances objectively indicate that there is no . . . ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution."  *Davis v. Washington*, 547 U.S. 813, 822 (2006).

---

[6] We note also that the district court instructed the jury that what the prosecutor said was not evidence and that they had to rely on the evidence presented at trial.

20

We have held that a defendant's Confrontation Clause rights are not violated when an alien's I-213 form is admitted into evidence, even if the alien does not testify, because the statements in an I-213 form are not testimonial in nature. *Caraballo*, 595 F.3d at 1228-29. We explained in *Caraballo* that an I-213 form reflects biographical information about immigrants that is routinely collected from "every foreign entrant for the proper administration of our immigration laws and policies." *Id.* at 1229. Although the information in an I-213 form may also be used in a criminal prosecution of a person who smuggles immigrants, we concluded that the statements in the forms were non-testimonial because the information was "primarily used . . . for the purpose of tracking the entry of aliens into the United States." *Id.*

*Caraballo* establishes that the I-213 forms here are not testimonial in nature. Tskitishvili and Chkuaseli try to distinguish *Caraballo* by arguing that in *Caraballo* there was evidence presented that the purpose of I-213 forms was the routine processing of aliens and that the government failed to present similar evidence in this case. But they overlook that the government presented foundational evidence about the purpose of the I-213 forms. Marlett testified that Customs and Border Patrol routinely creates I-213 forms in the regular course of processing aliens. The district court did not violate the defendants' Confrontation Clause rights by admitting the forms into evidence.

21

**3.      The Other Evidentiary Challenges Lack Merit.**

Tskitishvili and Chkuaseli assert that the district court made several other erroneous evidentiary rulings at trial.  They argue that the district court should have excluded testimony from Marlett about searches he performed on the State Department's databases showing that there were no records of the passengers having visas to enter the United States, as well as his testimony about the requirement that a Georgian citizen must have a visa to enter the United States.  They also contend that the district court should have permitted them to question Sakhiashvili about whether the defendants asked him if he had papers to get into the United States.

First, we cannot say the district court abused its discretion when it allowed Marlett to testify about the searches that he ran on the State Department's databases.  Marlett testified that he ran searches in State Department databases using information from the passengers' I-213 forms and that the searches yielded no records for the passengers, meaning they did not have permission to legally enter the United States.  Tskitishvili and Chkuaseli argue that the district court abused its discretion in allowing Marlett to give this testimony because it constitutes hearsay.  We conclude that the testimony was admissible under a hearsay exception.

Federal Rules of Evidence 803(10) recognizes a hearsay exception for "[t]estimony . . . that a diligent search failed to disclose a public record or statement" where "the testimony . . . is admitted to prove that . . . the record or statement does not exist." Marlett's statement that his searches of public records—the State Department's databases—yielded no results was admissible. Tskitishvili and Chkuaseli argue that Marlett's statement does not meet the requirements of Rule 803(10) because testimony about the searches had to come from the State Department employee who was custodian of the records. This was not required. It is true that Rule 803(6), setting forth the hearsay exception for business records, requires that such testimony be given by the custodian of records. But Rule 803(10), which applies to public records, contains no corollary requirement. Even though Marlett was not the custodian of the State Department's records, the Federal Rules of Evidence allowed him to testify that his searches of State Department databases for information about the passengers yielded no results.

Second, Tskitishvili and Chkuaseli argue that the district court erred in allowing Marlett to testify that a Georgian citizen was required to have a visa to enter the United States. They contend that Marlett offered improper expert testimony; in effect they assert that the government had to introduce an expert witness to establish that Georgian citizens needed visas to enter the United States. We reject this argument.

23

A lay witness may testify to firsthand knowledge based on his observations. *See United States v. Marshall*, 173 F.3d 1312, 1315 (11th Cir. 1999). Marlett's testimony that a Georgian citizen needed a visa came from his firsthand knowledge gained through his employment experience, which required him to know when immigrants were required to have visas.

Even if the district court erred in admitting this testimony, any error was harmless because the jury heard from several other witnesses that Georgian citizens were required to have visas. Haines testified that the passengers were Georgian citizens who lacked the visas they needed to enter the United States. Sakhiashvili's testimony described how—after the United States denied his request for a visa—he sought to enter the country illegally. Because the government introduced the same information into the record through another witness, there was no prejudice or harm resulting from any error in allowing Marlett to testify about the visa requirement.

Third, Tskitishvili and Chkuaseli argue that the district court erred in barring them from asking Sakhiashvili on direct examination whether the defendants asked him if he had papers to get into the United States. The district court excluded this testimony on hearsay grounds. Even if we assume for purposes of this appeal that the district court erred in limiting Sakhiashvili's testimony, any error was harmless.

24

Sakhiashvili was permitted to answer this very question on redirect and he testified that he told Tskitishvili that he had papers to enter the United States.

Tskitishvili and Chkuaseli urge that the cumulative effect of each of these purported errors warrants a new trial. But the prosecutor's statement in closing was not error, and to the extent that Tskitishvili and Chkuaseli have identified any evidentiary errors that occurred at trial, they have shown no harm flowing from any such error. Viewing the record as a whole, we conclude that there was no cumulative error warranting a new trial.

## IV.    CONCLUSION

For the reasons set forth above, we affirm the judgments entered against the defendants by the district court.

**AFFIRMED.**

25